1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9   AMCO Insurance Company,           )   1:04-cv-06456-SMS
                                      )
10                  Plaintiff,        )   ORDER GRANTING IN PART AND
                                      )   DENYING IN PART PLAINTIFF'S
11       v.                           )   MOTIONS TO COMPEL DISCOVERY OF
                                      )   INTERNAL INVESTIGATION AND TO
12   MADERA QUALITY NUT LLC, et       )   COMPEL DEPOSITION OF CHRISTOPHER
     al.,                             )   GLENISTER (DOCS. 49 and 57)
13                                    )
                    Defendants.       )
14   _____)
                                      )
15   MADERA QUALITY NUT LLC, et       )
     al.,                             )
16                                    )
             Counter-Claimants,       )
17                                    )
         v.                           )
18                                    )
     AMCO INSURANCE COMPANY,          )
19                                    )
             Counter-Defendant.       )
20   _____)

21

22       Plaintiff's motions to compel deposition testimony and

23   discovery of Defendants' internal investigation and to compel the

24   further deposition testimony of Christopher Glenister came on

25   regularly for hearing on March 31, 2006, at 2:00 p.m. in

26   Courtroom 7 before the Honorable Sandra M. Snyder, United States

27   Magistrate Judge. Julian J. Pardini of Lewis Brisbois Bisgaard &

28   Smith, LLP, appeared on behalf of Plaintiff; Arturo Gonzalez of

Morrison & Foerster LLP and Jeffrey P. Davis of Dowling Aaron &
Keeler appeared on behalf of Defendants. After argument the
matter was submitted to the Court.

I. Background

The first amended complaint filed by Plaintiff on April 22,
2005, alleges jurisdiction pursuant to 28 U.S.C. § 1332 based on
diversity of citizenship, and it concerns conduct arising out of
a fire that occurred on August 11, 2003, at the Madera nut
processing facility of Defendant Madera Quality Nut, LLC (MQN), a
California corporation and the insured under a policy issued by
Plaintiff Amco Insurance Company (Amco). Plaintiff Amco alleges
that Defendant MQN, by its own officers and employees, and by
officers and personnel of several Virginia corporations of which
MQN is alleged to be a subsidiary (Defendants Madera Quality Nut,
Inc., Red River Roods, Inc., Universal Leaf Tobacco Company,
Inc., and Universal Corporation), engaged in fraud by claiming
fire loss based on business expenses and product damage that were
materially and intentionally inflated. Plaintiff Amco's claims
include the following: 1) declaratory relief based on intentional
concealment and/or misrepresentation voiding the insurance
policy, which is denied by Defendant MQN, and is manifested in
proofs of loss and other documentation submitted in connection
with examinations under oath in 2004 of various personnel and
officers of the Defendant corporations, and reflecting
concealment or fraud committed on the day after the loss and
thereafter, fraud concerning the quality, number, and type of
product allegedly damaged in the fire, the dollar value claimed
to be owed for loss or damage to the product, gross inflation of

Case 1:04-cv-06456-SMS   Document 73   Filed 04/11/06   Page 3 of 42

the value and quantity of items damaged, the security camera
videotape monitoring the interior of the site of the fire, the
dollar value falsely claimed as business interruption and extra
expense, the commingling of fire-damaged nut with old, unsaleable
Brazil nuts and Chinese blanched almonds, the existence or
destruction of various items of evidence and documents concerning
the exact quantity of nut product in the plant at the time of the
fire, the weekly reports of production, the time photographs were
taken in relation to removal of damaged product, pricing inedible
nut product at prices exceeding their actual value, purchase
contracts and other documents that would evidence the product in
the plant at the time of the fire, and the financial condition of
MQN until the time of loss; 2) declaratory relief regarding
restitution of the advance payment made by Amco to MQN should the
policy be determined to be null and void; 3) declaratory relief
regarding the amount of coverage owed to Defendant MQN under the
policy should the Court determine that coverage is owed; 4)
damages for common law fraud against all Defendants should the
Court determine that coverage is not owed; 5) declaratory relief
regarding entitlement to, and the amount of, an award for costs
of the Plaintiff insurer's investigation against all defendants
should the Court find Defendants liable for common law fraud; and
6) an award of punitive damages against all defendants for common
law fraud.

     In the answer filed on June 2, 2005, Defendants deny that
the alleged parent corporations do business through MQN, which is
now doing business as a corporation. They admit the advance
payment by Plaintiff in the amount of $533,521.95. It is admitted

that Red River wholly owned and was the parent corporation of

MQN, that MQN's earnings were included in Universal's financial

statements and accounting records, and that the other corporate

defendants were informed of the fraud allegations. However,

Defendants deny all factual assertions of imputed liability,

admit that a fraud investigation began in November 2003 as a

result of fraud allegations made by employee Rosemary Valladares,

and admit that Hearington communicated with her and received

documents regarding allegations of insurance fraud. It is

admitted that various employees and officers were present at the

site at various times. Defendants deny the major allegations of

the elements of the various claims. Defendants assert affirmative

defenses of failure to state a claim, a claim for damages, a

claim for tort damages, violation of the First Amendment in the

form of a claim for punitive damages, denial of a claim for fees

and costs, statute of limitations, bad faith breach of the

implied covenant of good faith and fair dealing underlying the

contract, Plaintiff's misconduct and negligence, lack of

causation, lack of justifiable reliance, failure of condition,

lack of statutory compliance, justification, excuse of

performance, third party misconduct, Defendant's reasonable

conduct undertaken in good faith, no intentional act, full

performance, lack of authorization or ratification, lack of

standing, lack of jurisdiction, estoppel, laches, waiver, unclean

hands, failure to mitigate, and further defenses if discovered in

the course of discovery.

On June 2, 2005, MQN filed a counterclaim against Amco for

breach of contract and breach of the implied covenant of good

faith, seeking special, general, economic, incidental, consequential, and punitive damages, as well as interest, fees, and costs. MQN alleged that Amco failed to advise and inform MQN how to document its claim of loss with the intent to increase the likelihood of a denied claim or decreased recovery, made false statements of fact to delay and reduce recovery, failed to consider MQN's position fairly, made an unreasonable coverage determination, attempted to force acceptance of reduced benefits, brought the instant lawsuit in order to enhance Amco's position in settlement discussions, failed to supervise and control its agents and attorneys, and violated various California statutes relating to insurers. MQN denied commingling of damaged and undamaged product with wrongful intent or other misconduct, alleged mitigation and salvage of product, and sought $810,813.46 as a result of Amco's breach of contract, representing the difference between the amount owed to MNQ and the amount paid.

On July 8, 2005, Amco answered the counterclaim, denying all the material factual allegations regarding wrongful conduct, and asserting defenses of failure to state a claim, bar to recovery based on the insurance contract, satisfaction of contractual obligations, unreasonable action by MQN, MQN's breach of the contract by way of material, intentional misrepresentation, lack of causation, third party causation, failure to mitigate, third party fault, statute of limitations, estoppel, unclean hands, waiver, lack of coverage, reasonable conduct, laches, unconstitutionality of punitive damages and of bad faith, accord and satisfaction, no entitlement to fees or interest, stacking of policies, credit or offset, and unclear claim. Amco sought a

1  declaration regarding the controversy as well as costs of suit.

2      II. <u>Motion to Compel Discovery of the Internal Investigation</u>

3      On January 19, 2006, Plaintiff filed a motion to compel

4  deposition testimony and discovery of the internal investigation

5  of insurance fraud undertaken by Defendant Universal Corporation

6  ("UC," MQN's parent company) after allegations of fraud were made

7  by MQN employees. Plaintiff filed a memorandum and the

8  declaration of Mohammed S. Mandagary in support of the motion.

9      Plaintiff seeks communications between employees and

10 witnesses regarding the fire and the loss and insurance claim

11 resulting therefrom, including interviews of MQN employees;

12 Defendant UC's entire investigation file, including but not

13 limited to summaries of interviews prepared by Randolph "Randy"

14 Robinson and reviewed by Mr. Joseph Hearington and reports,

15 notes, etc., generated during the course of the investigation by

16 Defendants' employees and management personnel; Plaintiff also

17 seeks to depose 1) Mr. Randolph Robinson, Manager of Internal

18 Auditing for UC and employee of Leaf Tobacco (Leaf), who

19 conducted a factual investigation and reported to Hearington; 2)

20 Mr. Joseph Hearington, Corporate Director of Internal Auditing

21 for UC, who, undertook an internal factual investigation of the

22 fraud allegations, interviewing MQN employees and examining the

23 books and records of MQN to determine if any fraud had occurred,

24 and reporting to UC's auditing committee; 3) Mr. James H.

25 Starkey, Vice President of UC and Senior Vice President of Leaf,

26 to whom Hearington also reported; 4) the members of the internal

27 audit committee, to whom the report was rendered and who are

28 identified in Plaintiff's memo (Doc. 49-1 at p. 3) as John B.

1  Adams, Jr., Thomas H. Johnson, Eddie N. Moore, Jeremiah J.

2  Sheehan, and Walter A. Stosch; and 5) the MQN employees who were

3  interviewed.

4       Alternatively, should this Court conclude that the

5  investigation was privileged, then Plaintiff asserts that

6  Defendants waived their right to argue attorney-client privilege

7  or work product doctrine pursuant to Cal. Evid. Code § 912(a) by

8  producing in this case, over Defendants' counsel's objection,

9  transcripts of depositions from the Valladares action (wrongful

10  termination proceeding in state superior court brought by

11  Valladares and others for termination of whistleblowers in

12  violation of public policy), consisting of Hearington's and

13  Starkey's (and unspecified others') testimony giving the time,

14  manner, purpose, and identities of those who conducted the

15  investigation and limited findings of the investigation; and by

16  placing the findings of the internal factual investigation at

17  issue by raising various affirmative defenses (third party

18  misconduct, good faith, lack of intentionality, and lack of

19  authorization or ratification) and filing the counterclaim that

20  put the investigation into issue.

21       Plaintiff requests that at the very least, the Court should

22  review the final report of the investigation in camera to

23  determine whether it is privileged in whole or in part, and order

24  disclosure of solely factual parts with redactions of portions

25  that constitute legal advice; and Plaintiff requests that the

26  Court order the deposition of MQN's in-house counsel regarding

27  the procedures involved in the investigation itself in order to

28  clear up the conflicting stories that MQN has offered about the

1  extent, nature and effect of counsel's involvement.

2      Plaintiff asks the Court to rule in its favor, grant the

3  motion to compel discovery, and preclude Defendants from

4  asserting the privilege and instructing witnesses not to respond

5  to questions at deposition.

6      Defendants filed opposition to the motion on February 17,

7  2006, including a memorandum of points and authorities and the

8  declarations of Arturo J. Gonzalez; Joseph W. Hearington;

9  Catherine H. Claiborne, associate general counsel for Leaf, and

10  as such in-house counsel to all Defendants; and Christopher A.

11  Brown of the Dowling firm.

12      On March 21, 2006, Plaintiff filed a reply with points and

13  authorities (Doc. 70).

14      III. <u>Analysis</u>

15          A. <u>Attorney-Client Privilege</u>

16              1. <u>Governing Law</u>

17      Fed. R. Evid. 501 provides:

18      Except as otherwise required by the Constitution
        of the United States or provided by Act of Congress
19      or in rules prescribed by the Supreme Court pursuant
        to statutory authority, the privilege of a witness,
20      person, government, State, or political subdivision
        thereof shall be governed by the principles of the
21      common law as they may be interpreted by the courts
        of the United States in the light of reason and experience.
22      <u>However, in civil actions and proceedings, with respect
        to an element of a claim or defense as to which State law</u>
23      <u>supplies the rule of decision, the privilege of a witness,
        person, government, State, or political subdivision thereof</u>
24      <u>shall be determined in accordance with State law</u>
        (Emphasis added).

25
26  The import of this provision is that in civil diversity cases in

27  which state law governs, state law governs the issue of

28  privilege. <u>Star Editorial, Inc. v. United States District Court</u>

for Central District of California, 7 F.3d 856, 859 (9th Cir.

1993). Here, the discovery in question relates to state law fraud

and bad faith claims; thus, the existence and extent of any

privilege is controlled by California law.

### 2. Whether Attorney-Client Privilege Applies to the Internal Investigation

#### a. General Principles

Under California law, all privileges derive from statutory

law. HLC Properties, Ltd. v. Superior Court, 35 Cal.4th 54, 59

(2005). Pursuant to the attorney-client privilege, confidential

communications between a client and a lawyer are privileged, and

the client may refuse to disclose, and prevent another from

disclosing, such communications. Cal. Evid. Code § 954. The

privilege extends to all forms of communication, including

transmission of specific documents. Mitchell v. Superior Court,

37 Cal.3d 591, 600 (1984).

A confidential communication between client and lawyer means

information transmitted between a client and his or her lawyer in

the course of that relationship and in confidence by a means

which, so far as the client is aware, discloses the information

to no third persons other than those who are present to further

the interest of the client in the consultation or those to whom

disclosure is reasonably necessary for the transmission of the

information or accomplishment of the purpose for which the lawyer

is consulted, and includes a legal opinion formed and the advice

given by the lawyer in the course of that relationship. Cal.

Evid. Code § 952. Thus, for example, the privilege extends to

communications that are intended to be confidential if they are

1  made to attorneys, business associates, or agents of the party or

2  his attorneys on matters of joint concern, when disclosure of the

3  communication is reasonably necessary to further the interest of

4  the litigant or purpose of the legal consultation. Oxy Resources

5  California LLC v. Superior Court, 115 Cal.App.4th 874, 890

6  (2004).

7      A client is a person who, directly or through an authorized

8  representative, consults a lawyer for the purpose of retaining

9  the lawyer or securing legal service or advice from him in his

10 professional capacity. Cal. Evid. Code § 951.

11     With respect to establishing a privilege, the Court

12 indicates which party has the burden of producing evidence and

13 the burden of proof with respect to an issue of preliminary fact

14 as implied by the rule of law under which the question arises,

15 and the Court determines the existence or nonexistence of

16 disputed preliminary facts. Cal. Evid. Code §§ 402, 405. The

17 burden of establishing the attorney-client privilege is on the

18 party claiming the privilege. HLC Properties, Ltd., 35 Cal.4th at

19 59-60. The party claiming the privilege must establish a prima

20 facie claim of privilege, or the preliminary facts essential to

21 the claim, namely, a that the communication was made in the

22 course of an attorney-client relationship; this means that it

23 must be shown that an attorney-client relationship existed with

24 respect to the communication in question. D.I. Chadbourne, Inc.

25 v. Superior Court, 60 Cal.2d 723, 729 (1964); Wellpoint Health

26 Networks, Inc. v. Superior Court, 59 Cal.App.4th 110, 123 (1997);

27 Travelers Ins. Companies v. Superior Court, 143 Cal.App.3d 436,

28 448 (1983). When that showing has been made, then the

1  communication is presumed to have been made in confidence, and

2  the opponent of the claim of privilege has the burden of proof to

3  establish that the communication was not confidential, Cal. Evid.

4  Code § 917, or to establish a prima facie showing that an

5  exception applies or a waiver occurred, Wellpoint Health

6  Networks, Inc., 59 Cal.App.4th at 123-24. Even if a communication

7  is made in the course of professional employment, it is not

8  privileged unless the client intends that it be treated in

9  confidence. D. I. Chadbourne, Inc. v. Superior Court, 60 Cal. 2d

10 at 732. Further, the mere delivery to an attorney of a

11 communication not originally privileged does not render the

12 communication privileged. Id. at 732-733.

13     General principles concerning the application of the

14 privilege in situations involving corporate clients were

15 discussed in D. I. Chadbourne, Inc., 60 Cal.2d at 733-38. Where

16 the person who gives information is an employee of a corporation

17 who is not a person charged with potential liability but is

18 merely a witness to matters that require communication to the

19 corporate attorney, then the information is the statement of an

20 independent witness and is not privileged. However, if the

21 information is required to be reported by the employee in the

22 ordinary course of business, then the employee is no longer an

23 independent witness, and his statement or report becomes that of

24 the employer; further, such a communication may be privileged if

25 the employer's dominant purpose is for confidential transmittal

26 to the employer's attorney. Id. at 736-38. It was emphasized that

27 in all corporate employer-employee situations, it is the intent

28 of the person from whom the information emanates that originally

governs its confidentiality (and thus its privilege); thus, where an employee is not expressly directed by the employer to make a statement, and he or she does not know that his statement is sought on a confidential basis or does not intend it to be confidential, the intent of the party receiving and transmitting the statement cannot control the question of privilege. Id. at 737-38. Where the employer directs the employee to make a statement, the intent of the employer controls. Id. at 738.

Factors considered in such situations include the degree of an employee's choice to make a statement and whether the employee has been informed of choice or requirement; if the employee has no choice to make a statement but is required by the corporate employer to make a statement, then the employee's state of mind is not greatly important; rather, it is a situation where the corporation may be the client who desires to communicate its knowledge to its attorney confidentially. Chadbourne, 60 Cal.2d at 734. Other factors are whether the statement is made by the employee directly to the employer, or indirectly to another; whether the employer was first consulted before the statement; and to whom the statement was intermediately and ultimately transmitted. Id. at 734-36.

b. Dominant Purpose of Investigation

In order for an employee's statement to be privileged, where a corporate entity is a client, the dominant purpose of the communication must be transmittal to an attorney in the course of professional employment; there is no privilege for a communication that is not made to, or for further communication to, an attorney, even though the communication might have some

connection with possible liability in the future, such as reports
submitted in the regular course of business for study or for
prevention of future accidents. Holm v. Superior Court, 42 Cal.2d
500, 507 (1954) (disapproved on another point in Suezaki v.
Superior Court, 58 Cal.2d 166 (1962)). However, even if the
attorney is acting in a nonlegal, business, capacity, it is
necessary to analyze the specific documents or communications to
ascertain whether the document purpose behind each one was or was
not the furtherance of the attorney-client relationship because
even when acting generally in a nonlegal, business capacity as an
investigator or fact finder, the attorney may be called upon to
give legal advice during the course of the representation, and
documents related to those communications should be protected
notwithstanding the original purpose of employing the attorney.
Wellpoint Health Networks, Inc. v. Superior Court, 59 Cal.App.4th
110, 122 (1997).

    Here, the declaration of Claiborne demonstrates that she was
assistant general counsel for Leaf and as such was responsible
for providing legal advice to UC and to the other defendants in
the action. She was informed of the allegations of fraud, and
without delay she undertook to perform an investigation with
respect to fraud in relation to the fire for the purpose of
assessing the claim and its veracity, giving advice if necessary,
taking corrective action, and minimizing legal exposure, which
she anticipated in the form of potential litigation, including
claims by governmental agencies, the insurance company, and the
employee. The purpose was to consider the criminal and civil
liability of her client and to give legal advice regarding those

problem. These functions concern consulting an attorney in her
capacity as such. The communications between Claiborne and her
client, including communications from and to employees
interviewed in the course of Claiborne's investigation, are
presumed to be confidential.

Other evidence confirms that counsel instituted, directed,
and controlled the investigation. Oberschmidt testified that
after witnessing the allegation of fraud on November 18, 2003, he
returned to Virginia and met with Hearington and counsel the next
day. (Mandegary's Decl., Ex. C at 54.) The deposition testimony
of Hearington (Mandegary's Decl., Ex. A at 120, 150, 153, 159,
174-75) confirms that although he was an auditing investigator
who generally had Robinson investigate for him, Hearington's
original meeting on this investigation was with Claiborne and
Oberschmidt; he reported his factual conclusions (finding no
fraud or that fraud could not be proved) to counsel on February
11, 2004; he considered the investigation to have been on behalf
of counsel; and he discussed the result with counsel and Starkey.
Starkey confirmed that the findings were discussed only in
meetings where counsel was present. (Mandegary's Decl., Ex. B at
46).

Further evidence of a predominant legal purpose consists in
the retention and consultation with attorneys from the Dowling
firm in Fresno, to whom Claiborne delegated the task of
participating in some interviews.

Plaintiff asserts that the investigation was merely factual.
Claiborne delegated part of the investigation to Hearington, the
head of the UC internal audit department, who in turn delegated

some tasks to Robinson; however, this appears to have been a
delegation of part of the work to others who were in a position
to be familiar with the business procedures, practices, and
documentation in question. During the investigation, counsel
retained control, advising Hearinton of the potential legal
impact of the allegation, and supervising him and communicating
with him at least every other day; she approved his delegation of
interviewing MQN employees and reviewing on-site documents to
Robinson, an audit manager in Hearington's department. The
purpose of the interviews was to assess the veracity of the
allegation of fraud in order to best advise her clients on how to
proceed and to take any necessary steps to reduce exposure. She
considered the interviews to be confidential, just as if she had
sent a legal assistant to interview the employees on her behalf
in anticipation of litigation. She and Hearington conferred with
Robinson during the interview process, and with attorney Smith
regarding the status of the investigation. She considered the
entire process confidential and never disclosed it to any third
party.

The procedure of preparing the report and delivering the
report confirm that the investigation was predominantly for a
legal purpose. At the conclusion of the review of documents and
the investigation, Claiborne discussed with Hearington the report
that she and Hearington would be producing; he prepared a draft,
she reviewed and edited it, and they jointly presented it to
management. She considered the report privileged and had not
shared it contents with anyone but management and outside legal
counsel. She further stated that producing the documents would

impede her ability to give frank and open advice to her clients regarding the internal investigation.

Ramon Delgadillo, an employee of MQN who was interviewed, testified that he was sent to an office and told in January that a man from Universal was going to ask questions; he was instructed to go ahead and answer them; however, even though he was questioned about Valladares' claims regarding specific nuts in connection with the fire, he did not recall knowing of the purpose of the meeting and did not realize that the man was investigating the fire. (Mandegary's Decl., Ex. E at pp. 117, 120.) This testimony does not undermine what is otherwise a showing of a consistent expectation of confidentiality and a predominant purpose to provide legal assistance to the client in anticipation of litigation as distinct from merely to collect facts or to comply with legal requirements.

Although Claiborne did state that one purpose of the report was to comply with obligations under various statutes and regulations, including the Sarbanes-Oxley Act, no party has informed the Court or briefed what data or procedures would necessarily be encompassed by such an investigation. Nevertheless, Claiborne also was clearly concerned with potential litigation and exposure.

This case is analogous to Wellpoint Health Networks, Inc. v. Superior Court, 59 Cal.App.4th 110, 123-24 (1997), where there was evidence warranting a finding that counsel had been engaged to conduct an investigation of employment discrimination charges (thus establishing a prima facie case of privilege), but where in the absence of evidence that the regular course of business

16

involved the use of counsel to engage in routine fact-finding on behalf of the personnel department, the court concluded that there was no substantial evidence to support the trial court's conclusion that the attorney was actually acting as merely a fact finder and investigator. Here, the involvement of counsel in the investigation, coupled with the purpose to assess the exposure, advise the client, and take any necessary measures to reduce exposure, makes this more like Aetna Casualty & Surety Co. v. Superior Court, 153 Cal.App.3d 467, 475-76 (1984), where an insurer's hiring of an attorney to investigate the insured's claim and make a coverage determination under the policies was held to represent a classic example of a client seeking legal advice from an attorney, such that inapplicability of the privilege had to be decided on a document by document basis.

The present case differs from other cases where an attorney was hired to do primarily nonlegal tasks, such as Estate of Perkins, 195 Cal. 699, 710 (1925) (giving business advice), Montebello Rose Co. v. Agricultural Labor Relations Bd., 119 Cal.App.3d 1, 32 (1981) (being a labor negotiator for the client, which could have been accomplished by a non-attorney, such that unless the dominant purpose of a particular communication was to secure or render legal service or advice, it was not privileged); Watt Industries, Inc. v. Superior Court, 115 Cal.App.3d 802, 805 (1981) (acting merely as a business agent in conveying a client's position to a contracting party did not afford work product protection to the attorney's notes); In re Grand Jury Subpoena v. United States, 599 F.2d 504 (2nd Cir. 1979) (common law attorney-client privilege did not cover an investigation conducted by

1 management alone for the purpose of discovering facts, but it did

2 apply to a second investigation conducted by counsel with a

3 purpose to determine appropriate tax filings and to evaluate the

4 vulnerability of the corporation or its personnel to civil and

5 criminal sanctions); 2,002 Ranch, L.L.C. v. Superior Court, 113

6 Cal.App.4th 1377 (2003) (evidence reflecting a factual

7 investigation of a purchaser's claim regarding title insurance

8 was subject to discovery because although the in-house claims

9 adjusters were also licensed attorneys, the purpose of their work

10 was not legal, but rather was to do the work of a claims

11 adjuster, which was generally not done by attorneys in the

12 industry; however, the court was to analyze each requested item

13 to determine its dominant purpose and thus whether it was matter

14 reflecting the requesting of or rendering of legal advice

15 protected by the attorney-client privilege, or was subject to

16 work product protection); Diversified Industries, Inc. v.

17 Meredith, 572 F.2d 596 (8th Cir. 1978) (no privilege where the

18 legal services in question were for the sole purpose of

19 investigating facts and giving advice as to future conduct, which

20 in the circumstances could have been done by an accountant); Bio-

21 Rad Laboratories, Inc. v. Pharmacia, Inc., 130 F.R.D. 116

22 (N.D.Cal. 1990) (involving a federal work product issue

23 concerning factual information compiled by an attorney for

24 submission of a patent application, which was held not to be

25 privileged because it lacked confidentiality in view of the

26 expectation that it would ultimately be passed along to third

27 parties); Garcia v. City of El Centro, 214 F.R.D. 587 (S.D.Cal

28 2003) (involving a federal (§ 1983) claim stemming from a

1  disturbance, where city claims adjusters' interviews of officers

2  were not privileged because even if a claims adjuster were an

3  attorney, the officers were not seeking legal advice; rather,

4  claims adjuster's capacity was principally to determine whether

5  to pay suspect's claim).

6      Plaintiff's claim that the privilege cannot cover statements

7  by third party witnesses or statements to agents of counsel

8  should be rejected. Communications of an intermediate agent for

9  communication between an attorney and a client are covered by the

10 privilege. (City and County of San Francisco v. Superior Court,

11 37 Cal.2d 227, 236-37 (1951) (earlier statutory provision)

12 (observations of physician who examined a client for the attorney

13 who was preparing to litigate concerning the client's physical

14 condition were held to be covered by attorney-client privilege).

15 The use of a corporate auditor to gather, interpret, and

16 communicate facts to counsel, where it may reasonably be implied

17 that significant financial documents and records are involved, is

18 not unreasonable. Attorney communications with agents and

19 employees of a client, with the attorney giving and receiving

20 information to facilitate the purpose of the professional

21 employment, are protected. Travelers Ins. Companies v. Superior

22 Court, 143 Cal.App.3d 436, 448-52 (1983) (accident report by

23 insureds to insurers was protected by attorney-client privilege

24 if the insurer was obligated to defend the insured, even if the

25 ultimate attorney had not yet been retained, so long as the

26 communication was intended to help the attorney hired to handle

27 the defense); Scripps Health v. Superior Court (Reynolds), 109

28 Cal.App.4th 529, 535 (2003) (holding privileged incident reports

1   that were primarily created for the purpose of attorney review by
2   in-house counsel but were also used by the risk managers as de
3   facto insurance claims handlers).

4       The Court concludes that the dominant purpose was to obtain
5   information with the ultimate intent to provide legal advice, and
6   that the employer's agents intended the communications to be
7   confidential.

8                           3. <u>Fraud Exception</u>

9       Plaintiff argues that the fraud exception applies.
10  Defendants do not address this argument.

11      Cal. Evid. Code § 956 provides that there is no privilege if
12  the services of the lawyer were sought or obtained to enable or
13  aid anyone to commit or plan to commit a crime or a fraud. To
14  invoke the exception, the proponent must make a prima facie
15  showing that the services were sought or obtained to enable or
16  aid anyone to commit or plan to commit a crime or fraud;
17  consideration of the intent of the client, and not that of the
18  lawyers, must be considered. <u>State Farm Fire and Casualty Co.</u>, 54
19  Cal.App.4th 625, 643, 645 (1997). Further, it is determined
20  whether there is a reasonable relationship between the crime or
21  fraud and the attorney-client communication. <u>Id.</u> at 645. It is
22  not permissible to require disclosure of privileged material in
23  order to determine the presence of a prima facie case. <u>Id.</u>

24      Here, no evidence has been submitted by Plaintiff in support
25  of its assertion of the exception's applicability. Plaintiff's
26  argument is that because it is alleging fraud by MQN and its
27  parent corporations, which allegedly had knowledge of the
28  fraudulent insurance claim by virtue of the internal factual

1   investigation, and because Defendants have not produced any

2   evidence they obtained to prove or disprove the allegations,

3   Defendants have concealed clearly relevant information concerning

4   the fraud, and thus, Defendants have furthered the fraudulent

5   activity. The complaint was unverified. The mere fact that

6   Defendants have conducted an internal investigation regarding

7   allegations of fraud, the subject of the present suit, does not

8   warrant an inference that they concealed information or that the

9   client intended to engage in a fraud. The Defendants' claiming of

10  the privilege with respect to its investigation is not

11  inconsistent with a legitimate claim of privilege. It is the

12  burden of the party asserting the exception to establish the

13  exception.

14      The Court thus concludes that Plaintiff has not submitted

15  evidence constituting a factual basis adequate to support a good

16  faith belief by a reasonable person that the purpose of the

17  consultation was to enable or aid a fraud. Plaintiff has not

18  established an exception to the privilege.

19                 4. Waiver of the Attorney-Client Privilege

20      Cal. Evid. Code § 912(a) provides that except as otherwise

21  provided, the right of a person to claim the attorney-client

22  privilege is waived with respect to a communication protected by

23  the privilege if any holder of the privilege, without coercion,

24  has disclosed a significant part of the communication or has

25  consented to disclosure made by anyone; consent to disclosure is

26  manifested by any statement or other conduct of the holder of the

27  privilege indicating consent to the disclosure, including failure

28  to claim the privilege in any proceeding in which the holder has

the legal standing and opportunity to claim the privilege.
Section 912(c) and (d) provide that a disclosure that is itself
privileged is not a waiver, nor is disclosure of a privileged
communication when disclosure is reasonably necessary for the
accomplishment of the purpose for which the lawyer was consulted.
Once a prima facie showing of privilege has been made, it is then
the burden of the party asserting the waiver to establish that
the privilege has been waived. Wellpoint Health Networks v.
Superior Court, 59 Cal.App.4th 110, 123-24 (1997).

### a) Waiver by Production of Depositions Taken in the Valladares Action

Plaintiff argues that MQN's production of deposition
transcripts from depositions taken in the Valladares state action
(wrongful termination and discipline), and specifically those of
Mr. Hearington and Mr. Starkey, vice president of Universal (UC)
and Senior Vice President of Leaf, constituted a waiver by
disclosure. The deposition transcripts were submitted at the
direction of the undersigned Magistrate Judge over Defendants'
initial objections.

First, given the context of the disclosure, it does not
appear that a voluntary disclosure occurred. It was agreed that
the testimony would not constitute a waiver of the privilege when
the testimony was originally given, and the testimony was given
in the context of numerous, consistent objections to revelation
of the content of privileged communications. (Decl. of
Mandegaray, Ex. A, Decl. of Hearington at 150-152, 170-73.)  In
this action, it was the Court that directed the disclosure of the
information over objection.

1    However, in any event, Cal. Evid. Code § 912 provides that a

2    waiver by disclosure does not result unless a significant part of

3    the communication has been disclosed. As previously noted,

4    disclosure of the time, manner, purpose, and identities of those

5    conducting the investigation, as distinct from the communications

6    themselves, would not be privileged matter. The privilege

7    protects communications; it does not protect facts related to a

8    communication, such as the fact that a communication took place,

9    or the time, date, and participants in the communication; it does

10   not prevent disclosure of underlying facts which may be referred

11   to within a qualifying communication. 2,002 Ranch, L.L.C. v.

12   Superior Court, 113 Cal.App.4th 1377, 1388 (2003) (citing State

13   Farm Fire & Casualty Co. v. Superior Court, 54 Cal.App.4th 625,

14   640 (1997)). It is not a violation of the privilege for a

15   participant in an investigation to divulge the existence of

16   documents or other evidence that were uncovered during the

17   investigation. State Farm Fire & Casualty Co. v. Superior Court,

18   54 Cal.App.4th 625 (1997). Relevant case law makes it clear that

19   mere disclosure of the fact that a communication between client

20   and attorney occurred does not amount to disclosure of the

21   specific content of that communication, and as such does not

22   necessarily constitute a waiver of the privilege. Mitchell v.

23   Superior Court, 37 Cal.3d 591, 601-02 (1984). Further, disclosure

24   of the fact of a communication and the conclusion of a

25   communication has been held not to be sufficient to establish a

26   waiver under § 912. Southern California Gas Company v. Public

27   Utilities Commission, 50 Cal.3d 31, 46- (1990) (company's

28   statement that its attorney had gone over a contract and

23

determined that there was no way it could have been legally cancelled without subjecting the client to a lawsuit did not constitute disclosure of a significant part of a privileged communication).

Thus, the Court concludes that Plaintiff has not established that disclosure of the time, manner, purpose, and identities of those conducting the investigation, and the limited findings of the investigation at deposition, constituted a waiver under § 912.

b.  Implied Waiver by Putting the Internal
        Factual Investigation in Issue

Citing Kaiser Foundation Hospitals v. Superior Court, 66 Cal.App.4th 1217, 1226 (1998), and Steiny & Co. v. California Elec. Supply Co., 79 Cal.App.4th 285, 292 (2000), Plaintiff argues that when MQN filed a counter-claim for bad faith arising out of Amco's handling of MQN's insurance claim on the theory that Amco had no reasonable basis for denying MQN's claim, MQN raised issues at the core of the factual investigation.

There is no formal "client litigant" exception to the attorney-client privilege in California. City and County of San Francisco v. Superior Court, 37 Cal.2d 227, 238 (1951.) However, the general proposition of an implied waiver by affirmative conduct has been recognized by the California Supreme Court. In Mitchell v. Superior Court, 37 Cal.3d 591 (1984), the court held that plaintiffs seeking emotional distress damages from entities involved with chemicals that had contaminated ground water around the plaintiffs' home had not put communications with her counsel about chemicals at issue; rather, she had put into issue the

1  reasonableness of her fears about the chemicals; there was no

2  waiver of the attorney-client privilege because the substance of

3  the protected communication was not itself tendered in issue, but

4  instead the underlying evidence simply represented one of the

5  several forms of indirect evidence in the matter. Again, in

6  Southern California Gas Company, 50 Cal.3d 31 (1990), the court

7  considered a gas company's application for rate relief and

8  expenditures that involved proving that its expenditures were

9  reasonable in light of all the information that the utility's

10 decision makers knew or should have known at the time. 50 Cal.3d

11 at 40. The court recognized that the federal standard of implied

12 waiver was similar to California's: assertion of the privilege

13 was a result of some affirmative act, such as filing suit, by the

14 asserting party; through the affirmative act, the asserting party

15 put the protected information at issue by making it relevant to

16 the case; and application of the privilege would have denied the

17 opposing party access to information vital to his defense. Id. at

18 42. The court determined that the utility had not placed its

19 privileged communications in issue; it had not stated that it

20 intended to rely on its attorneys' advice or state of mind to

21 demonstrate that it acted reasonably when it acted, and it in

22 fact had expressly stated otherwise. The court held that because

23 the attorney's advice or state of mind was not in issue, there

24 was no implied waiver of the attorney-client privilege. Even if

25 fairness were separately considered, the court in Southern

26 California Gas, 50 Cal.3d at 43, noted that there was no evidence

27 to indicate that the privileged information was vital to a fair

28 adjudication because the issue of the reasonableness of the

1  utility's action in terminating a contract involved some legal

2  analysis, but it was not the actual legal analysis of the

3  attorneys who had represented the utility in the past, but rather

4  was an objective issue that depended on the terms of the contract

5  itself and the surrounding factual circumstances. It was possible

6  for the utility to meet its burden of proof without disclosing

7  its actual legal advice. Although actual legal advice might have

8  been relevant, it was not essential. The court confirmed that

9  privileged communications do not become discoverable simply

10  because they are related to issues raised in the litigation; such

11  an approach would create an intolerable burden upon the privilege

12  and make it very difficult for parties to a confidential

13  relationship to discuss openly matters which might eventually

14  lead to litigation. Id. at 44-45.

15      The court in Southern California Gas, 50 Cal.3d at 41-43,

16  favorably cited Aetna Casualty & Surety v. Superior Court, 153

17  Cal.App.3d 467 (1984), where an insurer sought declaratory relief

18  that its policy provided no coverage for an insured's claim, and

19  the insured cross-complained, alleging bad faith denial of

20  coverage. The insured sought discovery of the insurer's

21  communication with its attorneys, alleging that the insurer had

22  waived the privilege because it was using advice of counsel as a

23  defense and that the insurer's state of mind was at issue. The

24  court held that the insurer had not impliedly waived its

25  attorney-client privilege because it was not relying on advice of

26  counsel to show that it had acted reasonably, but instead sought

27  to show that its conduct was reasonable based on the underlying

28  facts. Further, the fact that the insurer's state of mind was at

1   issue in the insured's bad faith action did not place in issue

2   its attorneys' state of mind or their advice.

3       The Supreme Court of California has limited application of

4   the implied waiver principle to the "one situation in which a

5   client has placed in issue the decisions, conclusions, and mental

6   state of the attorney who will be called as a witness to prove

7   such matters." Mitchell v. Superior Court, 37 Cal.3d at 605;

8   Southern California Gas, 50 Cal.3d at 42-43.

9       Here, the affirmative conduct relied on by Amco is MQN's

10  filing of a counterclaim for breach of the insurance contract and

11  bad faith breach of the implied covenant of good faith in making

12  the coverage determination. By asserting that Amco's conduct was

13  in bad faith and unreasonable, MQN has not put the decisions,

14  conclusion, and/or mental state of MQN's counsel directly in

15  issue; instead, it is the reasonableness of Amco's conduct that

16  is in question, which can be determined by reference to Amco's

17  knowledge and other circumstances surrounding its coverage

18  determination. Application of the privilege will not deny Amco

19  access to information vital to its defense; Amco already has

20  access to the circumstances surrounding its decision on MQN's

21  insurance claim. Further, Amco will still be able to conduct

22  discovery regarding the underlying facts relating to the nature

23  and extent of the claim and any asserted misrepresentation; it is

24  only the communications involved in the investigation that are

25  privileged. Application of the privilege would not deny Amco

26  access to information vital to its defense of the breach of

27  contract or bad faith counterclaims.

28      Amco argues in its reply that because the counterclaim

27

explicitly states that MQN has complied with all terms and conditions of the Amco policy, which contains provisions requiring MQN's cooperation in Amco's own investigation and prohibiting fraud, it has put its internal investigation in issue. Although facts pertinent to MQN's cooperation and conduct are relevant, the counterclaim does not put counsel's advice or state of mind directly in issue, render it information vital to a defense against the counterclaim, or otherwise require interference with privileged communications. Amco is free to conduct discovery regarding the underlying facts, including seeking the identity of the persons interviewed and deposing them, deposing MQN personnel regarding their states of mind and conduct in connection with the handling of the insurance claim, seeking documents not constituting privileged communications, etc. It is only the privileged communications that are protected.

Amco argues that various affirmative defenses in MQN's answer to the first amended complaint put the "investigation" in issue, including MQN's assertion that third persons other than Defendants caused the injuries and damages, Defendants acted in good faith with adequate cause and observed all reasonable commercial standards of conduct in their actions and dealings with Amco, and Defendants acted in good faith and did not intentionally violate Amco's rights or breach a duty owed to Amco. These matters do not put counsel's state of mind or advice directly in issue. Further, although it is extremely unlikely, even if it were true that MQN could only know the facts supporting these defenses via the internal investigation, the facts, as distinct from the investigation itself, are available

to Amco via discovery.

In this case, Defendants and Counterclaimants have not put the privileged internal investigation directly in issue as would be the case where an employer defended a hostile environment discrimination claim and pleaded the adequacy of its pre-litigation investigation into the claimed misconduct as a defense. Further, this is not a case like <u>Steiny</u>, 79 Cal.App.4th 285, 292 (2000), where a plaintiff's evidence regarding damages was appropriately barred because the plaintiff's privilege had prevented the opposing party from examining key evidence. Here, the underlying evidence regarding Defendants' conduct in making the insurance fraud claim is not barred; it is only privileged communications regarding the investigation which are removed from the case. Plaintiff has not established an implied waiver.

### 5. <u>Scope of Discovery</u>

Because Defendants have shown that the investigation was directed, supervised, and conducted by counsel with the dominant purpose of gaining information from the client in order to give legal advice, communications in the course of the investigation from corporate employees to counsel and her agents participating in the investigation, and communications from counsel and counsel's agents, are privileged.

The Court is mindful of the important societal relationships and interests underlying the privilege. The Court is also concerned that the privilege not be applied to impede discovery of the unprivileged underlying facts of the events and transactions that are relevant in this lawsuit. The privilege protects communications; it does not protect facts related to a

communication, such as the fact that a communication took place, or the time, date, and participants in the communication; it does not prevent disclosure of underlying facts which may be referred to within a qualifying communication. 2,002 Ranch, L.L.C. v. Superior Court, 113 Cal.App.4th 1377, 1388 (2003) (citing State Farm Fire & Casualty Co. v. Superior Court, 54 Cal.App.4th 625, 640 (1997)). It is not a violation of the privilege for a participant in an investigation to divulge the existence of documents or other evidence that were uncovered during the investigation. State Farm Fire & Casualty Co. v. Superior Court, 54 Cal.App.4th 625 (1997). Thus, while actual interviews themselves and communications among attorneys and employees of the corporations and communications to attorneys would be privileged, the fact that employees were interviewed (i.e., the fact that communications themselves were made and associated data, such as the employees' names, the time, date, participating people, etc.) would not be privileged. The underlying information and facts would be discoverable.

Further, although no exception or waiver has been demonstrated by Plaintiff, it may be that further discovery will reveal facts upon which Plaintiff may renew its assertion of waiver or exception.

Finally, it does not appear that any specific request to conduct any in camera review is before the Court, and so the Court denies Plaintiff's request for in camera review. The Court notes that with respect to the attorney-client privilege, which is governed by California law, Cal. Evid. Code § 915, if binding on this Court, appears to foreclose in camera review of materials

claimed to be protected by the attorney-client privilege if

undertaken for the purpose of determining whether the materials

themselves are privileged.

      B. <u>Work Product Protection and the Fraud Investigation</u>

          1. <u>Governing Law</u>

Work product protection is governed by federal law because

it is not a privilege, but rather is a procedural immunity, or a

qualified protection from discovery. <u>Airheart v. Chicago & North

Western Transp. Co.</u>, 128 F.R.D. 669, 670-71 (D.S.D. 1989);

<u>F.D,I.C. v. Fidelity & Deposit Co. of Maryland</u>, 196 F.R.D. 375,

381 (S.D.Cal. 2000).

          2. <u>General Principles</u>

Fed. R. Civ. P. 26(b) provides in pertinent part:

> (3) Trial Preparation: Materials. Subject to the
> provisions of subdivision (b)(4) of this rule, a party
> may obtain discovery of documents and tangible things
> otherwise discoverable under subdivision (b)(1) of this
> rule and prepared in anticipation of litigation or for
> trial by or for another party or by or for that other
> party's representative (including the other party's
> attorney, consultant, surety, indemnitor, insurer, or
> agent) only upon a showing that the party seeking
> discovery has substantial need of the materials in the
> preparation of the party's case and that the party is
> unable without undue hardship to obtain the substantial
> equivalent of the materials by other means. In ordering
> discovery of such materials when the required showing
> has been made, the court shall protect against
> disclosure of the mental impressions, conclusions,
> opinions, or legal theories of an attorney or other
> representative of a party concerning the litigation.
> . . . .
> (5) Claims of Privilege or Protection of Trial
> Preparation Materials. When a party withholds
> information otherwise discoverable under these rules by
> claiming that it is privileged or subject to protection
> as trial preparation material, the party shall make the
> claim expressly and shall describe the nature of the
> documents, communications, or things not produced or
> disclosed in a manner that, without revealing
> information itself privileged or protected, will enable
> other parties to assess the applicability of the

1    privilege or protection.

2    Rule 26(b)(3) substantially codifies the holding of <u>Hickman v.</u>

3    <u>Taylor</u>, 329 U.S. 495 (1947) and provides that work product

4    protection extends to documents and tangible things prepared in

5    anticipation of litigation or for trial by or on behalf of a

6    party. <u>Holmgren v. State Farm Mut. Auto. Ins. Co.</u>, 976 F.2d 573,

7    576-77 (9th Cir. 1992). The primary purpose is to prevent

8    exploitation of a party's efforts in preparing for litigation and

9    thereby to encourage independent and efficient development of

10   facts and issues. <u>Id.</u> The threshold requirements of the

11   protection are that the matter constitutes documents sought by a

12   party that were prepared for trial by a party or a representative

13   of a party. <u>Id.</u>

14        A court should consider whether but for the pendency or

15   imminence of the litigation, the document would have been

16   created. <u>Newport Pacific, Inc. v. County of San Diego</u>, 200 F.R.D.

17   628, 632 (C.D.Cal. 2001). Documents generated in the ordinary

18   course of business, or for another purpose unrelated to

19   litigation, are generally not subject to work product protection

20   because they would have been created without regard to

21   litigation. <u>Griffith v. Davis</u>, 161 F.R.D. 687, 690 (C.D.Cal.

22   1995). It must be determined whether in light of the nature of

23   the document and the factual situation in the particular case the

24   document can fairly be said to have been prepared or obtained

25   because of the prospect of litigation. <u>United States ex rel.</u>

26   <u>Bagley v. TRW, Inc.</u>, 212 F.R.D. 554, 560 (C.D.Cal. 2003) (quoting

27   <u>Colonial Gas Co. v. Aetna Cas. & Sur. Co.</u>, 144 F.R.D. 600, 605

28   (D.Mass. 1992)). In determining whether a document was prepared

1  in the ordinary course of business or because of litigation,

2  factors to be considered include the type of the document, the

3  nature of the litigation, the relationship of the parties, the

4  involvement of counsel, and any other facts peculiar to the case.

5  Kidwiler v. Progressive Paloverde Ins. Co., 192 F.R.D. 536, 542

6  (N.D.W.VA 2000).

7      Where there are joint purposes of producing documents, with

8  one being with respect to anticipated litigation but another

9  being to achieve a business purpose or assist a business decision

10 that involves pending or prospective litigation, it is sufficient

11 if the document was prepared or obtained because of the prospect

12 of litigation. In re Grand Jury Subpoena (Mark Torf/Torf

13 Environmental Management, 357 F.3d 900, 907 (9th Cir. 2004).

14 Under the "because of" standard, a court does not consider

15 whether litigation was a primary or secondary motive behind the

16 creation of a document; rather, it considers the totality of the

17 circumstances and affords protection when it can fairly be said

18 that the document was created because of anticipated litigation,

19 and would not have been created in substantially similar form but

20 for the prospect of litigation. Id. at 908. However, when after

21 considering the facts surrounding the creation of the documents,

22 it appears that the litigation purpose so permeated any non-

23 litigation purpose that the two purposes cannot be discretely

24 separated from the factual nexus as a whole, then the documents

25 are entitled to work product protection. Id. at 909-10.

26      To be protected, documents or things must have been prepared

27 in anticipation of litigation or trial. Commencement of a lawsuit

28 is not required, although there must be some possibility of

33

1  litigation, <u>In re Grand Jury Investigation</u>, 599 F.2d 1224, 1229

2  (3d Cir. 1979), even though no specific claim need have arisen,

3  <u>In re Sealed Case</u>, 146 F.3d 881, 885-87 (D.C.Cir. 1998).

4      The holder of the immunity includes the attorney who

5  prepared the work product. <u>Doubleday v. Ruh</u>, 149 F.R.D. 601, 606

6  n. 5 (E.D.Cal. 1993).

7                          3. <u>Analysis</u>

8      Here, although no litigation had commenced, Claiborne's

9  declaration establishes that she subjectively anticipated

10 potential employment law claims as well as possible civil and

11 criminal liability for unlawful, fraudulent conduct as well and

12 litigation by the insurer because of the allegations of

13 Valladares. Her belief was objectively reasonable as well. Thus,

14 it appears that litigation was sufficiently anticipated.

15     It is not clear that the investigation's documentation and

16 process would have proceeded in the same form had there not been

17 anticipation of litigation. No evidence has been produced with

18 respect to this.

19     From the evidence submitted to the Court, it is not possible

20 to separate any business purpose of the investigation and the

21 purpose to assess and advise regarding anticipated litigation.

22 The Court concludes that the documents created in the course of

23 the investigation were created in anticipation of litigation and

24 are subject to work product protection.

25                    4. <u>Crime-Fraud Exception</u>

26     Plaintiff argues that the fraud exception to work product

27 protection applies. Plaintiff argues that its allegation of

28 common law (insurance) fraud against MQN and against its parent

                              34

1  corporations on a theory of agency, ratification and approval,

2  and vicarious liability make relevant the knowledge of the parent

3  corporations of fraud and any conduct thereafter, such as

4  concealing any fraud from the insurer and thus allowing MQN to

5  submit a fraudulent insurance claim. Because MQN knew that Amco

6  was investigating fraud but had not produced any evidence that

7  they obtained to prove or disprove the allegations of the fraud

8  investigation, MQN concealed clearly relevant information and

9  thus furthered the fraudulent activity.

10      "The crime-fraud exception may be used to abrogate work

11  product protection as well as the attorney-client privilege." In

12  re National Mortgage Equity Corp. Mortgage Pool Certificates

13  Litigation, 116 F.R.D. 297, 301 (C.D.Cal.1987); Cox v. Adm'r

14  United States Steel & Carnegie, 17 F.3d 1386, 1422 (11th

15  Cir.1994), amended by, 30 F.3d 1347 (11th Cir.1994), cert.

16  denied, 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995).

17  However, mere allegations or charges of fraud are insufficient to

18  invoke the crime-fraud exception. United States v. Chen, 99 F.3d

19  1495, 1503 (9th Cir. 1996).

20      Here, Plaintiff has submitted only the unverified

21  allegations of the complaint and argument; there is no evidence

22  before the Court that would warrant a conclusion that Defendants

23  intended to facilitate fraud in connection with any specific

24  piece of work product. Plaintiff has not demonstrated that an

25  exception applies.

26              5) Waiver

27      The Court rejects Amco's assertion that there has been a

28  waiver of any work product protection because MQN did not claim

1   the privilege until the filing of MQN's opposition papers. The

2   responses of MQN to Amco's first set of requests for production

3   of documents (Ex. H to Mandegary's Decl.), dated October 15,

4   2005, indicate that both attorney-client and work product were

5   the bases of MQN's objections to requests for documents generated

6   during, and correspondence regarding, the investigation conducted

7   by Hearington in November 2003. On the basis of the evidence

8   submitted to the Court Plaintiff has not established a waiver by

9   a failure to claim the privilege.

10                    6. <u>Scope of Discovery</u>

11      The precise nature of any documents subject to work product

12   protection is not before the Court. The Court notes that various

13   levels of work product protection exist depending upon the nature

14   of the document in question. Further, the Court notes that

15   Plaintiff has not sought to make a specific showing that any

16   document subject to work product protection should be disclosed

17   because of need, although Plaintiff has reserved the right to

18   make such a showing in connection with specific claims of work

19   product protection.[1]

20      IV. <u>Motion to Compel Deposition Of Christopher Glenister</u>

21      Plaintiff seeks to compel the further deposition of

22   Christopher Glenister, a certified public accountant, to testify

23   regarding communications he had with employees of Defendants, to

24   identify individuals present during conversations he had with

25   Defendants' employees, and to question him on unspecified

26

27          [1] The Court notes that no privilege log has been submitted to the Court.
    Counsel agreed at the hearing of the motions that after receiving the Court's
28   ruling on these motions, counsel would meet and confer regarding further
    discovery.

"specific areas and topics where the attorney-client privilege
and/or the attorney work product doctrine was improperly asserted
and/or invoked."

     A. <u>Facts</u>

Glenister's deposition establishes that he was employed by
MQN's public adjuster, the Greenspan Company, in order to assist
MQN in evaluating and preparing its insurance claim beginning on
September 25, 2003. He understood in that capacity that the claim
could result in litigation and thus his activities were to be
maintained in the strictest confidence. He had not finalized the
claim, and he had not prepared a sworn proof of claim for MQN to
submit to Amco before the internal fraud investigation started.

In early January 2004 he learned about the claim of
insurance fraud and at about that same time learned that
Claiborne had initiated and would direct a confidential internal
investigation into the allegations of illegal conduct; he was
requested by counsel to consult regarding the investigation
because of his familiarity with the insurance claim. He was
advised that private information would be shared with him and was
to be maintained in confidence, that he would communicate with
counsel and employees as part of the internal investigation, and
that all his activities related to the internal investigation
were subject to the attorney-client privilege. His participation
in interviews was pursuant to Claiborne's request and under her
direction as part of the internal investigation; he never
discussed the content of the interviews with anyone other than
counsel and the auditing employees who were collecting the
information on counsel's behalf, and he never disclosed the

content of the interviews or identity of interviewees to any third party because he understood that the interviews were privileged and confidential.

In her supplemental declaration, Catherine H. Claiborne confirmed that when the fraud investigation began, MQN had already retained Greenspan, and Glenister had been working with MQN on the insurance claim for three months.

Then, because the fraud allegations related directly to the fire insurance claim, and because Glenister was experienced with the claim and familiar with MQN's nut processing operations, counsel determined that Glenister's participation in the investigation would be very helpful to her efforts to provide legal counsel to her clients, so she approved Glenister's participation in interviews of MQN employees conducted by Randy Robinson. She considered his assistance to be like that of a legal assistant because he was a CPA and a hired consultant, and his information was important to the legal advice she was providing to her clients. Disclosing the contents of employee interviews conducted by auditing with legal counsel present at the direction of general counsel's office would impede her ability to serve as an attorney. Access to the mental impressions of defendants' counsel or to the substance of the conversations with employees was not necessary to permit Amco fairly to present their case for trial.

At the hearing, it was clarified that the disputed discovery did not concern Glenister's activity for the employer before the fraud investigation; rather, it was his participation in the fraud investigation, and specifically with respect to the

1  interviews of Tapia and Willits, that was the subject of

2  discovery, as well as his discussions with counsel before

3  deposition.

### B. Attorney-Client Privilege

5       Defendants have not established that the attorney client

6  privilege protects any of Glenister's pre-fraud activity.

7       The declarations of Glenister and Claiborne establish that

8  as of some time in January 2004, Glenister, an employee or other

9  agent of the employer, was participating in the fraud

10 investigation at the request and direction of counsel in order to

11 facilitate the purpose of counsel's professional employment.

12 Thus, a privilege attaches to communications made between

13 Glenister and counsel. Cf. City and County of San Francisco v.

14 Superior Court, 37 Cal.2d 227, 236-37 (1951) (a physician

15 employed by an attorney to examine the client for counsel in

16 regard to the subject of the attorney's representation held to be

17 covered as an agent of the attorney); People v. Meredith, 29

18 Cal.3d 682, 690 n.3 (1981).

19      Further, as previously noted, the fact that communication

20 occurred through agents of counsel, or that persons whose

21 presence was reasonably necessary to effectuation of the purpose

22 of the employment were present during communications, does not

23 vitiate the privilege.

24      With respect to whether or not Mr. Davis was representing

25 Glenister at the deposition, the Court finds that Defendants have

26 established by Glenister's declaration that Glenister was

27 represented by Mr. Davis, who was providing him with

28 representation and advice at Defendant's expense with Glenister's

1   consent.

2       The Court understands that Glenister's knowledge and
3   activities related to preparation of MQN's insurance claim were
4   not the subject of the disputed employee interviews; indeed,
5   there has been discovery of his percipient knowledge of facts
6   related to preparation of MQN's insurance claim and of
7   voluminous, non-privileged portions of Greenspan's file regarding
8   the insurance claim to Amco, including Glenister's working
9   papers, back-up materials, and loss spreadsheets upon which MQN's
10  insurance claim was based.

11      The Court reiterates that it is only communications with
12  counsel that are subject to the privilege. This would cover
13  conversations between Glenister and Davis in preparation for the
14  deposition. Communications with Hearington during the course of
15  the investigation or discussions with any MQN employees when any
16  MQN attorney was present during the course of the fraud
17  investigation could constitute privileged attorney-client
18  communications. Such a privilege would not protect identification
19  of who was present, or the date, time, participants, or location
20  of the communications. Again, it is only the communications that
21  are subject to attorney-client privilege, and not the
22  foundational facts concerning the communication, or the
23  underlying, independent facts.

24          C. <u>Work Product Privilege</u>

25      With respect to the fraud investigation, Defendants have
26  established that the investigation was undertaken in anticipation
27  of litigation. To the extent that Glenister was involved in the
28  fraud investigation, documents generated in the course of the

1  investigation would be subject to work product protection.

2  Defendants have not shown that Glenister's employment before the

3  fraud investigation was in anticipation of litigation.

4          V. Disposition

5     In light of the foregoing,

6     1. The Court DENIES Plaintiff's motion to compel discovery

7  of Defendants' internal investigation insofar as Plaintiff seeks

8  1) communications between employees of Defendant MQN and counsel

9  or agents of counsel made in the course of the fraud

10 investigation, including but not limited to interviews of MQN

11 employees, summaries of interviews or information received to be

12 forwarded to counsel, reports, or other communications, and 2)

13 documents or tangible things prepared by or for Defendants or by

14 or for Defendant's representative (attorney, consultant, or

15 agent) in the course of the investigation and thus in

16 anticipation of litigation; and

17    2. The Court GRANTS Plaintiff's motion insofar as Plaintiff

18 seeks to take the depositions of Randolph Robinson, Joseph

19 Hearington, James H. Starkey, members of the internal audit

20 committee to whom the report of the investigation was rendered,

21 and MQN employees who were interviewed in the course of the

22 investigation; however, the Court notes that Plaintiff may not by

23 deposition reach the substance of privileged communications made

24 between employees and agents of Defendant MQN and counsel in the

25 course of the investigation, or reach protected work product

26 materials; Plaintiff may question witnesses regarding the

27 underlying facts known by the witnesses, and may seek to

28 determine the time, date, place, and participants to

1  communications made in the course of the investigation; and

2      3. The Court GRANTS Plaintiff's motion to compel the further

3  deposition of Christopher Glenister to obtain testimony regarding

4  foundational facts of privileged communications, such as the

5  identity of individuals present during conversations he had with

6  Defendants' employees in the course of the fraud investigation,

7  and the time, date, and place of such conversations, and further

8  to obtain non-privileged evidence consisting of Glenister's

9  knowledge of facts pertinent to the issues raised by the

10  pleadings in this case; however, insofar as Plaintiff seeks to

11  question Glenister about his conversations with his counsel

12  before deposition or to obtain the substance or content of

13  privileged communications or to obtain documents protected as

14  work product, Plaintiff's motion to compel the further deposition

15  of Christopher Glenister IS DENIED; and

16      4. The Court DENIES Plaintiff's request that the final

17  report of the investigation be reviewed to determine whether it

18  is privileged in whole or in part; that MQN's in-house counsel be

19  deposed regarding the procedures involved in the investigation

20  itself in order to determine the extent, nature, and effect of

21  counsel's involvement; or that the Court preclude Defendants from

22  asserting the privilege and instructing witnesses not to respond

23  to questions concerning privileged or protected matters at

24  deposition.

25  IT IS SO ORDERED.

26  **Dated:   April 10, 2006  **         **/s/ Sandra M. Snyder**

    icido3                     UNITED STATES MAGISTRATE JUDGE

27

28