1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    EASTERN DISTRICT OF CALIFORNIA

8

AMCO Insurance Company,        ) 1:04-cv-06456-SMS
9                               )
                  Plaintiff,    ) ORDER DENYING PLAINTIFF AND
10                              ) COUNTER-DEFENDANT AMCO'S MOTION
      v.                        ) FOR PARTIAL SUMMARY JUDGMENT
11                              ) (DOC. 50)
MADERA QUALITY NUT LLC, et      )
12   al.,                       )
                                )
13                Defendants.    )
—————————————————————————————— )
14                              )
MADERA QUALITY NUT LLC, et      )
15   al.,                       )
                                )
16        Counter-Claimants,    )
                                )
17      v.                      )
                                )
18   AMCO INSURANCE COMPANY,     )
                                )
19        Counter-Defendant.    )
—————————————————————————————— )
20

21        The motion of Plaintiff and Counter-defendant AMCO Insurance

22   Company for partial summary judgment came on regularly for

23   hearing on May 4, 2006, at 9:30 a.m. in Courtroom 7 before the

24   Honorable Sandra M. Snyder, United States Magistrate Judge.

25   Julian J. Pardini appeared on behalf of Plaintiff and Counter-

26   defendant AMCO Insurance Company; Arturo Gonzales and Jeffrey P.

27   Davis appeared on behalf of Defendant and Counter-claimant Madera

28   Quality Nut (MQN). After argument, the matter was submitted to

                                   1

1  the Court subject to submission by Mr. Pardini of 1) Amco's

2  position on the waiver of some foundational objections, and 2)

3  input with respect to the communication of Passport notes within

4  the AMCO organization; Mr. Pardini subsequently submitted the

5  materials, and thus the case was submitted to the Court for

6  decision.

7      I. Background

8      Counter-defendant AMCO Insurance Company filed a motion for

9  summary adjudication of the bad faith counterclaim brought by

10 Madera Quality Nut (MQN) against it on January 16 through 24,

11 2006, including a motion, a separate statement of undisputed

12 material facts, a memorandum, and declarations of Russell Akins,

13 Chris Anderson, Gordon Park, and Susan Thompson in support

14 thereof. Counter-claimant MQN filed opposition on April 20, 2006,

15 including a statement in response to the separate statement of

16 undisputed facts, objections to evidence offered in support of

17 AMCO's motion, a memorandum, and declarations of Jeffrey P.

18 Davis, Joseph W. Hearington, and Arturo J. Gonzalez, with

19 exhibits A through Z (absent Exhibit M). Exhibit M to Gonzalez'

20 declaration (part 1 of 2) was filed on April 21, 2006. Further,

21 on April 21, 2006, a replacement to Exhibit B to Davis's

22 declaration was filed. On April 27, 2006, a reply was filed,

23 including evidentiary objections and a declaration of Sara J.

24 Savage. On May 5, 2006, the supplemental declaration of Jeffrey

25 P. Davis and attachments were filed. Mr. Pardini's declaration

26 withdrawing foundational objections was filed on May 11, 2006.

27 Further, by May 10, 2006, Mr. Pardini sent to opposing counsel

28 and submitted to the Court a fourteen-page letter and materials

concerning the Passport notes, including copies of portions of the Passport notes and excerpts of the depositions of David Melton, Russel D. Akins, and Christopher David Anderson. This material was subsequently filed. The Court has not received any indication from counsel for MQN that the material submitted by Mr. Pardini contains inaccuracies or is objectionable for any reason, or any other response.

In the good faith claim, MQN alleges that AMCO unlawfully, willfully, and maliciously denied payment of substantial insurance benefits to which MQN was entitled under the policy; AMCO breached the covenant of good faith and fair and honest dealing implied in the insurance contract, stonewalled MQN, and improperly denied the insurance claim. After the fire, AMCO failed to take independent steps to determine or document the type and amount of nut products damaged in the fire; guide or advise MQN with respect to the adjusting process (failure to instruct MQN to create a photographic inventory or written inventory of the contents of the plant at the time of the fire, and to instruct with detail as to documentation, level of details, and absolute precision required with respect to identification, segregation, inventory, and storage of damaged nut products); and AMCO calculatedly abandoned and ignored MQN in the critically important days, hours, and weeks after the fire with the intent to increase the likelihood that AMCO would find grounds to deny the claim and decrease the amount of the insurance claim that would ultimately be submitted to AMCO. MQN immediately reported the fire; despite a shortage of storage space and a need to move nuts inside the night of or after the

fire, MQN attempted carefully to identify and label the fire-damaged nuts, but some fire-damaged product was moved multiple times before being collected and stored in one of two on-site warehouses operated by MQN. MQN aggressively mitigated substantial additional losses that otherwise would have been submitted to AMCO for payment under the business interruption coverage of the policy by having employees clean and repair the plant to permit resumption of some production lines only a few days after the fire, but MQN would have directed them to create an absolutely precise fire loss inventory had AMCO advised MQN that it required absolutely accurate documentation of the quantity of fire-damaged nuts. MQN frequently updated AMCO, delivered lists itemizing damaged nuts, invited an inspection (which AMCO did not undertake until nearly a month after the fire), and submitted 356,487 pounds of fire-damaged nut products, which were shipped to a salvage company at AMCO's direction, for which AMCO was paid $89,000.00 salvage value. Before MQN submitted its sworn proof of claim to AMCO, AMCO made a partial payment of $533,521.95 but no additional payments. After assistance with the adjusting process by the Greenspan Company, MQN submitted a claim with a total damage value of $1,291,914.00 for the loss of income, extra expense, and business personal property, then revised it as of July 12, 2004, to $1,344,335.41, consisting of $170,142.85 in extra expenses, $65,423.78 in clean-up or debris removal, $650,170.95 in inventory replacement cost, $394,168.50 in other business personal property, and $64,429.33 in building property replacement.

It was further alleged that AMCO represented to MQN that the

4

claim was being investigated for fraudulent misrepresentation in
July 2004, whereas it had decided much earlier to deny it but
delayed in notifying MQN in order to prejudice MQN's ability
fairly and accurately to establish the validity of its claim. It
delayed processing of the claim; failed fairly and thoroughly to
investigate the claim; failed to control, supervise, and instruct
its claims agents and attorneys, made unreasonable settlement
offers, and delayed payment of the claim; unreasonably relied on
patently erroneous advice of counsel in furtherance of bad faith,
including, but not limited to, reliance upon intentionally self-
serving, biased reports of investigators and consultants; made
knowingly false interpretations of witness testimony; based its
coverage decision on its desire to reduce or avoid its
obligations; made an unreasonable interpretation of the policies
and refused to correct its decision; attempted to force MQN to
accept fewer benefits than it was otherwise entitled to under the
policy; and performed other, unspecified acts of bad faith.
Plaintiff alleges fraud, malice and oppression sufficient to
warrant punitive damages.

The grounds of the motion for summary adjudication on the
good faith claim are: 1) there is no genuine issue of material
facts as to AMCO's reasonable reliance on the advice of counsel
in denying MQN's claim for insurance proceeds such that as a
matter of law there is no bad faith or entitlement to extra-
contractual damages; 2) there is a genuine dispute concerning the
nature and extent of AMCO's coverage obligations to MQN, and thus
no bad faith; and 3) there is no genuine issue with respect to
MQN's inability to demonstrate by clear and convincing evidence

an intention by AMCO to harm it or any despicable conduct by

AMCO, and thus AMCO may not be held liable for punitive damages.

II. <u>Summary Judgment</u>

Summary judgment is appropriate when it is demonstrated that

there exists no genuine issue as to any material fact, and that

the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c). Under summary judgment practice, the

moving party

> [A]lways bears the initial responsibility of
> informing the district court of the basis for
> its motion, and identifying those portions of
> "the pleadings, depositions, answers to
> interrogatories, and admissions on file,
> together with the affidavits, if any," which
> it believes demonstrate the absence of a
> genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). It is the

moving party's burden to establish that there exists no genuine

issue of material fact and that the moving party is entitled to

judgment as a matter of law. <u>British Airways Board v. Boeing Co.</u>,

585 F.2d 946, 951 (9th Cir. 1978).

Where a party with the ultimate burden of persuasion at

trial as to a matter moves for summary judgment, it must

demonstrate affirmatively by evidence each essential element of

its claim or affirmative defense and must establish that there is

no triable issue of fact as to each essential element such that a

rational trier of fact could render a judgment in its favor.

<u>Southern California Gas Co. v. City of Santa Ana</u>, 336 F.3d 885,

888 (9th Cir. 2003). If a party moves for summary judgment with

respect to a matter as to which the opposing party has the

ultimate burden of persuasion at trial, then the moving party

1   must show that the opposing party cannot meet its burden of proof

2   at trial by establishing that there is no genuine issue of

3   material fact as to an essential element of the opposing party's

4   claim or defense; the moving party must meet the initial burden

5   of producing evidence or showing an absence of evidence as well

6   as the ultimate burden of persuasion. Nissan Fire Ltd. v. Fritz

7   Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000). In order to

8   carry its burden of production, the moving party must either

9   produce evidence negating an essential element of the opposing

10  party's claim or defense or show that the nonmoving party does

11  not have enough evidence of an essential element to carry its

12  ultimate burden of persuasion at trial. Id. (citing High Tech

13  Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 574

14  (9th Cir. 1990)). In order to carry its ultimate burden of

15  persuasion on the motion, the moving party must persuade the

16  court that there is no genuine issue of material fact. Id.

17      However, "where the nonmoving party will bear the burden of

18  proof at trial on a dispositive issue, a summary judgment motion

19  may properly be made in reliance solely on the pleadings,

20  depositions, answers to interrogatories, and admissions on file."

21  Celotex Corp. v. Catrett, 477 U.S. 317, 323. Indeed, summary

22  judgment should be entered, after adequate time for discovery and

23  upon motion, against a party who fails to make a showing

24  sufficient to establish the existence of an element essential to

25  that party's case, and on which that party will bear the burden

26  of proof at trial. Id. "[A] complete failure of proof concerning

27  an essential element of the nonmoving party's case necessarily

28  renders all other facts immaterial." Id. In such a circumstance,

7

1   summary judgment should be granted, "so long as whatever is

2   before the district court demonstrates that the standard for

3   entry of summary judgment, as set forth in Rule 56(c), is

4   satisfied." Id. at 323.

5        If the moving party meets its initial responsibility, the

6   burden then shifts to the opposing party to establish that a

7   genuine issue as to any material fact actually does exist.

8   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

9   586 (1986). In attempting to establish the existence of this

10  factual dispute, the opposing party may not rely upon the denials

11  of its pleadings, but is required to tender evidence of specific

12  facts in the form of affidavits or admissible discovery material

13  in support of its contention that the dispute exists. Rule 56(e);

14  Matsushita, 475 U.S. at 586 n.11. The opposing party must

15  demonstrate that the fact in contention is material, i.e., a fact

16  that might affect the outcome of the suit under the governing

17  law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

18  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809

19  F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine,

20  i.e., the evidence is such that a reasonable jury could return a

21  verdict for the nonmoving party, Wool v. Tandem Computers, Inc.,

22  818 F.2d 1433, 1436 (9th Cir. 1987).

23       In the endeavor to establish the existence of a factual

24  dispute, the opposing party need not establish a material issue

25  of fact conclusively in its favor. It is sufficient that "the

26  claimed factual dispute be shown to require a jury or judge to

27  resolve the parties' differing versions of the truth at trial."

28  T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary

1  judgment is to 'pierce the pleadings and to assess the proof in

2  order to see whether there is a genuine need for trial.'"

3  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)

4  advisory committee's note on 1963 amendments). The evidence of

5  the opposing party is to be believed, Anderson, 477 U.S. at 255,

6  and all reasonable inferences that may be drawn from the facts

7  placed before the court must be drawn in favor of the opposing

8  party, Matsushita, 475 U.S. at 587 (citing United States v.

9  Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam)).

10 Nevertheless, it is the opposing party's obligation to produce a

11 factual predicate from which an inference may be drawn. Richards

12 v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal.

13 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Although the

14 Court must not weigh the evidence, the Court must draw reasonable

15 inferences; evidence that is too insubstantial or speculative may

16 be insufficient to establish the existence of a genuine issue of

17 material fact. Coca-Cola Co. v. Overland, Inc., 692 F.2d 1250,

18 1255 (9th Cir. 1982); Dept. of Commerce v. U.S. House of Rep.,

19 525 U.S. 316, 334 (1999); Matsushita, 475 U.S. at 586. A mere

20 scintilla of evidence supporting the opposing party's position

21 will not suffice; there must be enough of a showing that the jury

22 could reasonably find for that party. Anderson, 477 U.S. at 251-

23 52. Where the record taken as a whole could not lead a rational

24 trier of fact to find for the nonmoving party, there is no

25 genuine issue for trial. Id. at 587.

26      The showings must consist of admissible evidence,

27 Hollingsworth Solderless Terminal Co. v. Turley, 622 F.2d 1324,

28 1335 n.9 (9th Cir. 1980), or pleadings, depositions, answers to

1    interrogatories, admissions, and affidavits or declarations, Fed.

2    R. Civ. P. 56(c). Affidavits shall be based on personal

3    knowledge, set forth such facts as would be admissible in

4    evidence, and show affirmatively that the affiant is competent to

5    testify to the matters stated therein. Fed. R. Civ. P. 56(e).

6    Sworn or certified copies of all papers or parts thereof referred

7    to in an affidavit shall be attached thereto or served therewith.

8    Id. Declarations pursuant to 28 U.S.C. § 1746 may be used with

9    the same force and effect as affidavits. Pollock v. Pollock, 154

10   F.3d 601, 611, n.20 (6th Cir. 1998). Personal knowledge may be

11   inferred from declarations themselves, such as from facts

12   concerning a declarant's position and participation, Barthelemy

13   v. Air Line Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990);

14   however, a court cannot draw an inference about facts not

15   specifically put in the record by a party, and a court will not

16   assume that general averments embrace specific facts needed to

17   sustain a complaint, Lujan v. National Wildlife Federation, 497

18   U.S. 871, 887 (1990). Unauthenticated documents cannot be

19   considered on a motion for summary judgment. Hal Roach Studios,

20   Inc. v. Richard Feiner and Co., 896 F.2d 1542, 1550 (9th Cir.

21   1990). Legal memoranda and oral argument are not evidence and do

22   not create issues of fact capable of defeating an otherwise valid

23   motion for summary judgment. British Airways Bd. v. Boeing Co.,

24   585 F.2d 946, 952 (9th Cir. 1978).

25       The Court is not obligated to consider matters that are in

26   the record but are not specifically brought to its attention; the

27   parties must designate and refer to specific triable facts. Even

28   in the absence of a local rule, for evidence to be considered,

the party seeking to rely on it must specify the fact by indicating what the evidence is or says and must indicate where it is located in the file. Although the Court has discretion in appropriate circumstances to consider other material, it has no duty to search the record for evidence establishing a material fact. Carmen v. San Francisco United School Dist., 237 F.3d 1026, 1029 (9th Cir. 2001).

   III. Evidence

   Numerous evidentiary objections are lodged by the parties. In many instances the following analysis contains rulings on the objections. The evidence considered by the Court has been set forth in the analysis so that the parties may know what has been considered by the Court and how it has been considered. In the interest of the efficient use of resources, some major categories of objections will be ruled upon generally, and legal standards will be set forth.

   One large category of objections stems from MQN's attorneys' having summarized documentary evidence in their declarations, as distinct from the customary practice of simply providing a foundation for the evidence and then referring to it in argument. The Court has not considered as evidence counsel's conclusions or characterizations. In other instances, counsel have directly declared facts to be true based on their personal knowledge instead of as a characterization of other evidence; in these instances, the Court has considered specific objections and has expressly ruled on them.

   Another substantial category of objections concerns the Passport notes and their evidentiary foundation. Considering the

1  post-hearing submission of Passport notes and the testimony of
2  Akins, Anderson, and Melton, the Court concludes that the
3  Passport entries are sufficiently authenticated. <u>See</u>, <u>Orr v. Bank</u>
4  <u>of America, NT & SA</u>, 285 F.3d 764, 776 (9th Cir. 2002).

5      Much of the evidence of AMCO's investigation consists of
6  data obtained by AMCO's agents in the course of the
7  investigation, such as statements made by witnesses or counsel,
8  reports, etc. The Court has considered this evidence not for the
9  truth of the matters asserted, but rather for the fact that the
10 particular statements were made, that the reports were rendered,
11 etc.

12     Numerous objections are made on the basis of a lack of
13 foundation. In some instances, these objections appear to be
14 based on a lack of personal knowledge on the part of the person
15 alleging a fact. Subject to the provisions relating to expert
16 opinion testimony (Fed. R. Evid. 703), a witness may not testify
17 to a matter unless evidence is introduced sufficient to support a
18 finding that the witness has personal knowledge of the matter.
19 Fed. R. Evid. 602. The burden is on the proponent to establish
20 personal knowledge to the extent that a reasonable trier of fact
21 could believe that the witness had personal knowledge about the
22 fact. <u>United States v. Joy</u>, 192 F.3d 761, 767 (7th Cir. 1999).
23 Personal knowledge must be established by admissible evidence,
24 including the witness's own testimony or extraneous sources. Fed.
25 R. Evid. 602; <u>United States v. Lake</u>, 150 F.3d 269, 273 (3d Cir.
26 1998).

27     Personal knowledge consists of what a witness actually
28 directly observed or perceived through his or her own senses.

1  Fed. R. Evid. 602, Adv. Comm. Notes (1972). Thus, both

2  opportunity to observe and actual observation must be

3  established. McCrary-El v. Shaw, 992 F.2d 809, 810-11 (8th Cir.

4  1993). Further, the source of the knowledge must be disclosed; it

5  is not sufficient for a witness merely to say that he or she is

6  aware of a fact. Ward v. First Federal Savings Bank, 173 F.3d

7  611, 617-18 (7th Cir. 1999) (mere statement that a witness was

8  aware of something was held to be insufficient to establish

9  personal knowledge to render the evidence admissible in

10  connection with a summary judgment motion). Personal knowledge

11  may include inferences so long as they are appropriately grounded

12  in personal observation and first-hand experience, United States

13  v. Joy, 192 F.3d 761, 767 (7th Cir. 1999) (circumstantial

14  evidence [observation of proceeds and their inspection by

15  possible purchasers, admissions of coparticipants that a burglary

16  had been committed with others, knowledge of a person's history

17  of having committed burglaries] held sufficient to establish a

18  foundation of personal knowledge). However, the inferences must

19  not be based on fancy, speculation, hunches, intuition, or

20  rumors. Stagman v. Ryan, 176 F.3d 986, 995-96 (7th Cir. 1999).

21      In other instances, the objection is accompanied by a

22  relevance objection or from context appears to be based on an

23  absence of authentication.

24      With respect to authentication, the Court notes that Fed. R.

25  Evid. 901 provides:

26      (a) The requirement of authentication or identification as a
    condition precedent to admissibility is satisfied by evidence
27  sufficient to support a finding that the matter in question is
    what is proponent claims.
28      (b) By way of illustration only, and not by way of

limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

. . .

(4) Distinctive characteristics and the like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

Unauthenticated evidence is not relevant. Evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Authentication constitutes "a special aspect of relevancy," Fed.R.Evid. 901(a) advisory committee's note; evidence cannot have a tendency to make the existence of a disputed fact more or less likely if the evidence is not that which its proponent claims. United States v. Branch, 970 F.2d 1368, 1370 (4th Cir. 1992). Upon objection, authentication or identification is a condition precedent to admissibility determined pursuant to Fed. R. Evid. 104(b), Ricketts v. City of Hartford, 74 F.3d 1397, 1409 (2nd Cir. 1996); the Court makes a preliminary determination as to whether there is sufficient evidence to sustain a jury finding of authenticity; ultimate resolution of whether evidence is authentic calls for a factual determination by the trier of fact. United States v. Branch, 970 F.2d at 1370. Authentication requirements are satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims, Fed. R. Evid. 901(a). It is sufficient if there is enough support in the record to warrant a reasonable person in determining that the evidence is what it purports to be; thereafter, the question of weight to be given to the evidence is left to the finder of fact. United States v.

14

1  Holmquist, 36 F.3d 154, 167 (1st Cir. 1994) (finding that a

2  photocopy of a check was authentic in light of the totality of

3  the circumstances, including the date, payee, amount, and

4  corroboration provided by its alleged receipt in a package that

5  included an invoice mentioning a credit in the amount of the

6  check) (quoting United States v. Paulino, 13 F.3d 20, 23 (1st

7  Cir. 1994). The burden of authentication does not require the

8  proponent of the evidence to rule out all possibilities

9  inconsistent with authenticity, or to prove beyond any doubt that

10 the evidence is what is purports to be; rather, the standard is

11 reasonable likelihood. Holmquist, 36 F.3d at 168.

12     Circumstantial evidence is sufficient to authenticate

13 evidence. United States v. Englebrecht, 917 F.2d 376, 378 (8th

14 Cir. 1990) (using a photograph of the Defendant with marijuana

15 plants after receiving testimony from third parties that the

16 Defendant had boasted that the crop was his); United States v.

17 Siddiqui, 235 F.3d 1318, 1322 (11th Cir. 2000) (authentication of

18 an e-mail by use of an address that had been used before, content

19 that only someone familiar with certain facts would have known,

20 use of a nickname, and extraneous conversational references to

21 the e-mail), cert. denied 533 U.S. 940; United States v. Bagaric,

22 706 F.2d 42, 67 (2nd Cir. 1983) (authentication of a letter by

23 the addressee, salutation, closing, postmark, content), abrogated

24 on other grounds in National Organization for Women, Inc. v.

25 Scheidler, 510 U.S. 249 (1994); see United States v. Lawrence,

26 934 F.2d 868, 871 (7th Cir. 1991) (voluntary production in

27 response to a demand by subpoena for corporate records used to

28 authenticate a record).

It is also possible to authenticate evidence by the act of
production in response to a subpoena. Unites States v. Lawrence,
934 F.2d 868, 871 (7th Cir. 1991) (corporate officer's voluntary
production in response to subpoena held to be sufficient to
authenticate the documents).

With respect to opinions, an opinion is an inference or
conclusion the witness draws from his or her personal perceptions
or acquired knowledge. Stagman v. Ryan 176 F.3d 986, 996 (7th
Cir. 1999). Aside from expert opinions based on specialized
knowledge within the scope of Fed. R. Evid. 702, an opinion of a
witness is admissible if rationally based on the perceptions of
the witness and helpful to a clear understanding of the witness'
testimony or a determination of a fact in issue. Fed. R. Evid.
701. Further, a party's evidence submitted with respect to a
summary judgment motion must be based on personal knowledge and
affirmatively show competence to testify. Fed. R. Civ. P. 56(e);
Fed. R. Evid. 602.

IV. Facts

It is undisputed that on August 11, 2003, a fire occurred at
MQN's nut processing plant in Madera, California, which caused
damage to the structure, equipment, and both raw and processed
nut products. MQN promptly reported the fire to its insurance
carrier, AMCO, which pursuant to a policy admittedly in force
covered stock up to $2,000,000 and covered business income and
extra expense up to $900,000. The policy contained a provision
that excluded from coverage an insured who committed fraud or
intentionally concealed or misrepresented any material fact or
circumstance concerning coverage, the covered property or the

insured's interest therein, or a claim under the coverage portion of the policy. As of November 10, 2003, AMCO advanced $233,521.95 for replacement of equipment and repairs to the building, and $300,000 for damaged nut products while awaiting verification of the total amount of that part of the loss. On that date, AMCO learned through Joe Thacker, an agent or broker of AMCO, that a former employee of MQN had informed Thacker that MQN managerial personnel had added old or unsaleable nuts to the damaged nuts and was thereby fraudulently inflating its insurance claim. The allegations of fraud dictated that AMCO investigate further.

Other pertinent disputed and undisputed facts are referred to in the course of the argument.

V. Reliance on Advice of Counsel

A. Legal Standard

An insurer has a duty not to withhold unreasonably payments due under a policy; if an insurer fails to deal fairly and in good faith with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy, such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing. Neal v. Farmers Ins. Exchange, 21 Cal. 3d 910, 920 (1978).

Here, AMCO claims that after its initial investigation of the fire claim, evidence of fraud arose. Employees and/or ex-employees of MQN reported to an insurance broker that the claim was being inflated. Learning of this, AMCO undertook an investigation, hired counsel, and determined from numerous interviews and sworn statements to deny the claim as fraudulent.

Reliance on the advice of counsel operates defensively in a

1   bad faith action in that it may tend to show that the insurer was

2   acting with proper cause and thus reasonably, and therefore it

3   will negate bad faith, and it may further negate fraud, malice,

4   or oppression for an award of punitive damages. <u>State Farm Mut.</u>

5   <u>Auto Ins. Co. v Superior court (Johnson)</u>, 228 Cal.App.3d 721,

6   725-26 (1991). The defense is a defense of negation, so it need

7   not be alleged as an affirmative defense in the answer; it is the

8   burden of the person asserting the defense to establish it. <u>State</u>

9   <u>Farm</u>, 228 Cal.App.3d at 725-26; <u>Bertero v. National General</u>

10   <u>Corp.</u>, 13 Cal.3d 43, 53 (1974) (recognizing the defense in

11   malicious prosecution actions where one has acted in good faith

12   and has disclosed to counsel all facts known to be relevant and

13   material). The elements are 1) the defendant acted on the opinion

14   and advice of counsel; 2) counsel's advice was based on full

15   disclosure of all the facts by defendant or the advice was

16   initiated by counsel based on counsel's familiarity with the

17   case; and (3) the defendant's reliance on the advice of counsel

18   was in good faith. <u>Melorich Builders, Inc. v. Superior Court</u>

19   <u>(Serabia)</u>, 160 Cal.App.3d 931, 936-37 (1984) (recognizing defense

20   to extreme and outrageous conduct in action for intentional

21   infliction of emotional distress); <u>Bertero</u>, 13 Cal.3d at 53;

22   <u>Dalrymple v. United Services Automobile Association</u>, 40

23   Cal.App.4th 497, 511, 414-15 (1995). However, reliance on the

24   advice of counsel is simply one factor pertinent to the

25   determination of whether or not the insurer's conduct was

26   reasonable. <u>State Farm Mut. Auto Ins. Co. v Superior court</u>

27   <u>(Johnson)</u>, 228 Cal.App.3d 725-26;

28       There is no defense where the insurer did not claim reliance

1  on counsel's advice, <u>Aetna Cas. & Surety Co. v. Superior Court</u>
2  <u>(Pietrzak)</u>, 153 Cal.App.3d 467, 475 (1984), or where the client
3  knew or had reason to know that the legal advice it was given was
4  incorrect, <u>Moore v. American United Life Ins. Co.</u>, 150 Cal.App.3d
5  610, 627-28 (1984); <u>Allen v. Allstate Insurance Co.</u>, 656 F.2d
6  487, 489 (9th Cir. 1981).

7        B. <u>Analysis</u>

8        It is undisputed that as AMCO performed its investigation
9  and gathered evidence, it hired Gordon Park of the Fresno law
10 firm of McCormick Barstow Shepard Wayte & Carruth LLP to help it
11 assess the evidence and examine key witnesses under oath. Park
12 conducted numerous examinations under oath, including those of
13 Carmina Tapia, the president of MQN; Grant Willits, the plant
14 manager; and Keith Herring, the production manager. Park declared
15 that after completing his own investigation and evaluating the
16 results of AMCO's investigation and Thompson's report, he
17 concluded that all MQN's explanations as to all of the
18 discrepancies were not credible. (Decl. of Park ¶ 13.)

19        1. <u>Complete Investigation</u>

20        It is disputed whether or not Mr. Park was provided with the
21 complete investigation performed by AMCO. Park declared that he
22 was provided with the complete investigation both as to
23 information accumulated by AMCO before he was retained and all
24 evidence and information uncovered by AMCO as its investigation
25 continued after he was retained; nothing was withheld from him.
26 (Decl. ¶ 5.) Akins, certified fire investigator and special
27 investigations unit investigator for AMCO, declared that Park was
28 provided with the complete investigation performed by AMCO.

(Decl. at ¶ 24.)

MQN notes the vague and conclusional form of these allegations and questions whether there is an adequate foundation for this statement. Although it is possible and even likely that Park and Akins have personal knowledge of what Park received, there are no facts detailed regarding what documents or materials were transmitted, by whom, or when.

Further, MQN argues that because Park could not recall if he had received the Passport entries made by Anderson and Melton, and because Lutkemuller, the AMCO employee who made the decision to sue, could not remember if anyone told him of AMCO's earlier inspection of the product, a rational jury could find that Park did not know about the Passport entries because had he known, he surely would have told Lutkemuller about them.

Park testified that he knew about the allegation of the commingling or mixing of nuts when he was retained. (Gonzalez Decl., Ex. H p. 43.) Park had spoken with Chris Anderson, but Anderson was no longer involved in the file at the time, and Park did not think it was before AMCO filed the lawsuit. (Gonzalez Decl., Ex. H at 9.) As to the Passport notes, Park would have had access to most of the file by the time he filed suit, so he concluded that it would have been before suit was filed; however, he did not recall when he first reviewed Chris Anderson's Passport entries in connection with the fire and was not sure if he saw every Passport note or if he received a copy of the Passport printouts before the lawsuit was filed; he knew he never saw a complete set because he had seen other references beyond what had been sent to him, and they were not part of the claim

file as such that he ever reviewed. (Id. at 9-11, 26). He had no
recollection of ever having talked with Thompson about the
Passport entries (id. at 32-33).

Excerpts of Passport entries were submitted by AMCO after
the hearing on the motion in connection with argument concerning
whether or not anyone from AMCO read the Passport notes or talked
to Chris Anderson. Passport notes indicate that persons working
for AMCO other than Anderson, including David Smith, Jeffrey
Kaiser, Brandi Bueto, and Jon Kempf, reviewed the file or
discussed it before September 9, the date of Anderson's second
inspection when he photographed the nuts. The same persons
discussed the claim with Anderson and spoke in depth about the
file; Akins reviewed the file notes on September 23, 2003; Melton
received the complete file on October 2 from the previous
adjuster and reviewed it, concluding that the insured had given
them a complete inventory of nuts; and on November 12, 2003,
Akins discussed with Anderson the handling to date and Anderson's
photos of the alleged damaged product.

AMCO also submitted excerpts of depositions reflecting that
Melton was sure he reviewed the Passport information when he took
over the file, believed that Anderson had inspected the property,
and believed that he had spoken with Anderson about the
inspection; Anderson at some point confirmed to Melton that
Anderson had seen a lot of nuts that were damaged; and Melton was
sure that he had reviewed Anderson's entries but did not recall
doing so; he would have relied on Anderson's entries. Melton
wrote that they could verify all of the destroyed nuts as
Anderson had seen and photographed them; he believed that that

21

1    was accurate.

2        Excerpts of the deposition of Akins reveals that he

3    testified that after Anderson inspected and took photographs, and

4    after Akins learned that there was a problem, Akins asked

5    Anderson if he inspected and if there were photographs; he could

6    not recall what Anderson said, but he also testified that

7    Anderson said that they identified the damaged product, and he

8    photographed it; he did not take the time to open the boxes; and

9    he did not know what else he could have done. If not the sole

10   conversation Akins had with Anderson about the inspection, this

11   was the primary one, but it may have been brought up in one

12   additional conversation. Akins reviewed the photographs taken by

13   Anderson in order to substantiate a visual inspection and to see

14   what the photos showed; no date was given with respect to this

15   review. Akins did not recall any specifics of talking with Melton

16   about Anderson's September inspection.

17       Excerpts of Anderson's deposition revealed that Anderson

18   testified that other than conversations with lawyers, Anderson

19   could not recall anyone asking about the inspection in light of

20   the later problem, although perhaps one of his coworkers or

21   someone, a manager, may have said something to that effect; he

22   had a conversation with David Melton about the case, and he

23   discussed the case with Brandi Bueto, the supervisor, by

24   recapping his file notes before putting the notes in the file and

25   updating her as to the status of the loss and what was being

26   found.

27       In summary, Park's and Akins' assertions that the complete

28   investigation was transmitted to Park are conclusional; Park did

1   not talk with Anderson before filing suit; and, in view of Park's

2   admission that he did not see the complete set of Passport notes,

3   reasonable inferences could be drawn both ways with respect to

4   Park's having seen or been aware of the Passport entries

5   regarding the inspection. Accordingly, drawing all reasonable

6   inferences in favor of MQN, the Court concludes that it may

7   reasonably be inferred that Park did not receive or know of the

8   particular Passport entries and thus did not receive the complete

9   investigation with respect to the inspection.

10      Gonzalez declares that Akins got samples of product from

11  Winslow that were just recently produced to MQN for inspection at

12  Park's office in Fresno. (Decl. ¶ 45.) AMCO objects that this

13  evidence lacks foundation, is based on hearsay and inadmissible

14  testimony not before the Court, and is irrelevant. However, it

15  may be concluded that Gonzalez has personal knowledge that

16  samples purporting to be Akins' collection from Winslow had

17  recently been produced. Further, the evidence is relevant to

18  whether or not the investigation was complete.

19      In a letter to Akins dated January 16, 2004, Park stated

20  that he believed that Akins should interview Winslow and obtain a

21  recorded statement; if Winslow had any of the remaining nuts

22  which were not sold, and especially if he confirmed that some of

23  the nuts were not damaged, Park wanted samples, records showing

24  to whom he sold any nuts, and records from buyers. (Gonzalez

25  Decl., Ex. N p. 7.) This document, when viewed in context with

26  the other communications, contains sufficient indicia for

27  authentication. The Court considers it for the purpose of the

28  statement having been made as distinct from the truth of the

23

matter asserted.

Park could not remember whether Akins obtained samples of the product from Todd Winslow, the salvage purchaser, although he vaguely remembered that there might have been some samples taken by him or somebody; he never looked at them or spoke to anyone about whether one could tell from inspecting either a container or nuts whether the product had actually been in a fire. (Decl. of Gonzalez, Ex. H pp. 61, 67-68.)

As a matter of common sense, actual samples of the nut product, and any information they would reveal, would be relevant information with respect to the presence of undamaged nuts in the salvage sold to Winslow; further, the samples would potentially have great probative force with respect to whether or not there had been inflation of the claim. Further, it may be inferred that Park requested that such samples be taken and that such samples existed. The Court concludes that in this context, the failure of Park to recall if there were samples warrants an inference that the samples, or data regarding them, were not transmitted to Park.

Park sent a letter to AMCO dated November 22, 2004, in which he stated that after completing his investigation, evaluating the results of AMCO's investigation, and Thompson's report, he had concluded that MQN violated the policy provisions barring concealment, misrepresentation and fraud by misrepresenting the time Willits' photographs were taken so as to mislead AMCO as to the quantity of nuts damaged by the fire; concealed and misrepresented the existence of the security camera videotape that would have shown the quantity of nuts in the plant at the

1   time of the fire; misrepresented that old, rotted, unsaleable

2   Brazil nuts and Chinese blanched almonds were fire-damaged;

3   intentionally commingled fire-damaged nuts to inflate the claim

4   grossly; and overvalued the business interruption and extra

5   expense claim. (Park Decl. ¶ 13, Ex. 6 (Park's letter of November

6   22, 2004, to Akins).)[1] In the letter, Park states that the letter

7   merely confirms in writing his coverage recommendations

8   previously made orally at an unspecified time; further, he

9   drafted and filed a complaint with the authority of AMCO and had

10  it served. However, MQN's objection of hearsay is sustained with

11  respect to inferring the truth of the matters asserted in the

12  letter.

13       AMCO asserts that various facts follow from the conclusions

14  reached by Park in his letter and from Park's declaration to the

15  effect that he investigated and concluded that there had been

16  violations as described in his declaration and as noted in the

17  attached report. The facts AMCO asserts are established by this

18  evidence include Park's having performed a thorough review of

19  applicable California law regarding insured's misrepresentation

20  in presenting a claim, examined all possible defenses the MQN

21  might raise in an action to void the policy, considered all

22  possible remedies apart from voiding the policy, and found none

23  satisfactory. Although the declaration and attachments might

24  warrant an inference of a thorough investigation, it does not

25

26

27       [1] The Court notes that the letter was dated November 22, 2004, a date
    after the date upon which the docket reflects that the present lawsuit was
    filed, namely, October 26, 2004. The Court further notes that a letter to

28  Tapia describing the coverage decision and investigation, and inviting a
    factual response, was dated November 19, 2004 (Park Decl., Ex. 5).

appear to preclude an inference to the contrary. Further, there is no basis before the Court upon which to conclude regarding the sufficiency or accuracy of Park's legal opinion; AMCO has not mounted a legal argument to this effect or cited any legal authority to this Court.

Park testified that he was fairly certain that before he filed suit, he knew that Valladares and two other employees, one a former employee, had filed a lawsuit against MQN in connection with the fire; its relevance to him was that the pleading was interesting. (Gonzales Decl., Ex. H at 39.)

Erich Lutkemuller testified that he was the person within AMCO who actually decided to file the lawsuit; he had read the Passport file pertaining to the claim, but he did not remember what part he had read at the time when he decided to file the lawsuit. (Decl. of Gonzalez, Ex. G at 12-13.) He did not recall reading the entries of Chris Anderson before making the decision or at any time, but he recalled sitting down and discussing the facts identified in the investigation of Akins and Park with Akins and Park; with that information he made a decision. (Id. at 13.) He had no knowledge about the record-keeping or inventory practices of MQN. (Id. at 25.) He never conversed with Chris Anderson or David Melton. (Id. at 14.) He did not recall whether he had a discussion with anybody on the actual inspection of the nuts by Anderson. (Id. at 50.) He did not recall discussing the inspection with Park or Akins. Further, he characterized Pentorali as an employee; he testified that AMCO first knew there was a concern with the claim when AMCO's agent, Joe Thacker, received a telephone call on November 10, 2003, from "one of

1  Madera Quality Nut's employees" indicating concerns other the
2  claim being filed. (Id. at 25-26.) Lutkemuller stated that in
3  deciding to sue, it was important to look at the whole picture
4  and not consider just one person's word. (Id. at 26-27.) When he
5  decided to sue, he was not aware that or when any of the MQN
6  accusers had filed a lawsuit against MQN; it was not part of his
7  conversation. (Id. at 27.)

8      In summary, the Court concludes that a rational trier of
9  fact could conclude that the complete investigation was not
10 communicated to Park or to the AMCO representative who determined
11 to sue because a rational trier of fact could reasonably infer
12 that they did not receive or review Passport notes or a full
13 report thereof, concerning Anderson's inspection; did not receive
14 information regarding samples of the salvaged nuts; and did not
15 apprehend the employment status of the initial complainant
16 regarding the alleged fraud. Further analysis of the thoroughness
17 of the investigation, apart from what was communicated to Park or
18 to Lutkemuller, appears below in connection with the issue of the
19 presence of a genuine dispute. However, focusing on what was
20 communicated, it may be concluded that Park's advice was not
21 based on, and was not evaluated by Lutkemuller in light of, the
22 complete facts of the investigation.

23              2. Reliance on Counsel's Advice

24      With respect to whether or not AMCO actually relied on the
25 advice of counsel in filing suit, Akins' declaration that AMCO
26 relied on Park's advice in deciding to file the instant action
27 (Decl. ¶ 26) suffers from a lack of personal knowledge. Although
28 Akins communicated facts of the investigation to Lutkemuller, it

1  is not clear that Akins was a party to, or was aware of, the

2  actual decision making process at AMCO with respect to the

3  determination of the claim or the filing of the suit.

4       However, Lutkemuller testified that he recalled sitting down

5  with Akins and Park, discussing the facts identified in their

6  investigation, and with that information making a decision

7  (Gonzalez Decl., Ex. G p. 13.) This warrants an inference that

8  Lutkemuller, the decision maker, relied on Park's advice

9  regarding the significance of the facts and investigation in

10 deciding to bring suit.

11      Park declares that as Amco performed its investigation, it

12 hired Park (the date of hire was not stated) and his firm to help

13 it assess the evidence and examine key witnesses; Park was

14 provided with the complete investigation performed by Amco both

15 before and after he was retained; he wrote to Carmen Tapia,

16 president of MQN, explaining his conclusion of fraud and

17 providing her with information not otherwise provided; and he

18 concluded in a letter to Amco (actually addressed to Russell

19 Akins) dated November 22, 2004, that MQN had violated the policy

20 provision barring concealment and misrepresentation with respect

21 to the quantity of nuts damaged by the fire, the existence of a

22 security camera videotape, the fire-damaged status of old, rotted

23 unsaleable Brazil nuts and Chinese blanched almonds, commingling

24 fire-damaged nuts with undamaged nuts grossly to inflate the

25 claim, and overvaluation of business interruption and extra

26 expense claim. (Decl. at 2-3, Ex. 6.) In the letter, Park

27 recommended pursuing an action to void the insurance policy for

28 fraud and to recoup the advance payment, (at pp. 11, 27);

1  further, he stated that "with authority from Amco, we drafted and

2  filed" the complaint in the instant action and had it served;

3  further, "in accordance with our discussions, and my

4  recommendation, the Complaint sets forth" the basis for the

5  common law fraud claim." (Id. at p. 27.) The instant lawsuit was

6  filed on October 26, 2004.

7      It may be inferred that this letter itself is pretextual, in

8  that it appears to have postdated the decision to deny the claim

9  and file suit. Further, a rational trier of fact could infer that

10 the actual legal opinion postdated the conference among

11 Lutkemuller, Park, and Akins. However, in view of Lutkemuller's

12 testimony, it may also be inferred that Park had given advice

13 during the earlier conference.

14      Thus, the Court concludes that an issue of fact exists as to

15 whether or not AMCO relied on the advice of counsel (as distinct

16 from a discussion of facts) in making its decision.

17                    3. Good Faith

18      With respect to whether or not the reliance on Park's advice

19 was in good faith, Akins declared that AMCO had no reason to

20 believe that Park's conclusions and recommendations were wrong at

21 the time it denied MQN's claim and filed this declaratory relief

22 action. (Decl. ¶ 27.) Akins likewise declared that AMCO maintains

23 today that Park was correct in the conclusions and advice

24 rendered in the November 22, 2004 letter. (Id. ¶ 28.)

25      MQN objects to this evidence as a conclusion, as argument,

26 as without foundation, and as not supported by the cited

27 evidence, noting that a rational jury could easily disagree with

28 Park's conclusion. The Court rules that this statement lacks a

1  showing of personal knowledge and foundation, and further

2  consists of an inadmissible conclusion.

3      Arturo Gonzalez's declaration (at 13) refers to excerpts of

4  the testimony of Erich Lutkemuller (Ex. G to Decl. of Gonzalez),

5  who testified at deposition that he was the Amco employee who

6  decided to sue MQN for fraud but did not know Valladares had sued

7  MQN for eighty million dollars, could not recall if he knew that

8  AMCO's own agent had inspected the product or had viewed

9  Anderson's computerized PASSPORT entries, and had never spoken

10  with Chris Anderson about his inspection of the product.

11  Lutkemuller testified that whether the nuts were damaged by smoke

12  could have been determined both visually and by taste, and that

13  if Amco had obtained samples of the product from the salvage

14  buyer, Creative Ingredients, Amco could have tested it for

15  damage. (Gonzalez Decl., Ex. G.)

16      AMCO objects on various grounds, including lack of

17  foundation and hearsay. The Court overrules these objections.

18      It is undisputed that the insurer made substantial partial

19  payments. The thoroughness and objectivity of the investigation

20  conducted and evaluated by AMCO's personnel and agents (Akins,

21  Park, Lutkemuller, and others) is discussed more fully below in

22  connection with the issue of the presence of a genuine dispute.

23  Because issues of fact exist as to the thoroughness and

24  objectivity of the process and thus the reasonableness of the

25  insurer's conduct, it is concluded that an issue of fact exists

26  as to whether or not the insurer's reliance was in good faith.

27  ///

28  ////

1        VI. <u>Genuine Dispute</u>

2        AMCO argues that there was a genuine dispute regarding

3   coverage affecting entitlement to benefits and the scope of the

4   loss; because AMCO's position was reasonable, it cannot have

5   breached the covenant of good faith and fair dealing.

6            A. <u>Legal Standards</u>

7        The gist of the tort of bad faith breach of the implied

8   covenant of good faith and fair dealing is unreasonable conduct

9   on the part of the tortfeasor, or conduct without proper cause;

10  bad faith breach involves something beyond breach of the

11  contractual duty itself and implies unfair dealing rather than

12  mistaken judgment, or conduct prompted not by honest mistake, bad

13  judgment, or negligence, but rather by a conscious and deliberate

14  act which unfairly frustrates the agreed common purposes and

15  disappoints the reasonable expectations of the other party.

16  <u>Chateau Chamberay Homeowners Association v. Associated</u>

17  <u>International Insurance Co.</u>, 90 Cal.App.4th 335, 346 (2001).

18      An insurer's bad faith is ordinarily a question of fact to

19  be determined by a jury by considering the evidence of motive,

20  intent, and state of mind; however, the question becomes one of

21  law where there is no dispute as to the underlying facts, and due

22  to an absence of conflicting inferences, reasonable minds could

23  not differ. <u>Chateau</u>, 90 Cal.App.4th 335, 350 (2000). A court may

24  grant summary judgment when it is undisputed or indisputable that

25  the basis for the insurer's denial of benefits was reasonable,

26  such as where even under the plaintiff's version of the facts

27  there is a genuine issue as to the insurer's liability under

28  California law. <u>Amadeo v. Principal Mutual Life Ins. Co.</u>, 290

31

1   F.3d 1152, 1161-62 (9th Cir. 2002). However, an insurer is not

2   entitled to summary judgment as a matter of law where, viewing

3   the facts in the light most favorable to the plaintiff, a jury

4   could conclude that the insurer acted unreasonably. <u>Amadeo v.</u>

5   <u>Principal Mutual Life Ins. Co.</u>, 290 F.3d 1152, 1161-62 (9th Cir.

6   2002) (reversing summary judgment because a rational trier of

7   fact could have concluded that the insurer's legal position

8   regarding interpretation of the policy was arbitrary, and that in

9   investigating the insured's disability, the insurer selectively

10  sought and considered evidence).

11       The Court acknowledges that, as AMCO states, where the

12  genuine dispute relates to policy interpretation, which is

13  customarily a legal issue for decision by the Court, the

14  insurer's reasonableness is a question of law to be decided by

15  the Court. <u>Chateau Chamberay Homeowners Association</u>, 90

16  Cal.App.4th at 348 n.7. Here, however, the issue is not the

17  reasonableness of the insurer's interpretation of any specific

18  policy provision. Instead, the case involves a factual issue

19  regarding the insurer's conduct in investigating and denying a

20  claim; if the essentially factual issue of whether or not the

21  insurer acted in bad faith or reasonably in its treatment and

22  denial of the claim is resolved, then the application of the

23  policy is likewise determined. The issue in the present case is a

24  question properly decided as a matter of law only if, pursuant to

25  the authorities previously noted, the inferences regarding the

26  reasonableness or cause for the insurer's actions are not in

27  conflict, or if it is undisputed or indisputable that the basis

28  for the insurer's denial of benefits was reasonable, such as

where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law.

Application of California's genuine dispute doctrine is on a case-by-case basis and may be applied where the assertedly genuine dispute concerns not only an issue of insurance law but also where it involves a factual dispute. Guebara v. Allstate Ins. Co., 237 F.3d 987, 993-94 (9th Cir. 2001). A genuine dispute may be present where an insurer denies a claim based on the opinions of independent experts. Chateau, 90 Cal.App.4th at 346-47 (citing Fraley v. Allstate Ins. Co., 81 Cal.App.4th 1282, 1292 (2000) (which held in turn that a substantial disparity in estimates of repair costs by dueling experts relied upon by the opposing parties did not by itself suggest that the insurer acted in bad faith)).

Mistaken or erroneous withholding of policy benefits, if reasonable or if based on a legitimate dispute as to the insurer's liability under California law, does not expose the insurer to bad faith liability. Chateau, 90 Cal.App.4th at 346-47. However, the mere presence of a purely factual dispute between the insurer and the insured does not necessarily mean that the genuine dispute doctrine may be properly applied. Id. at 348.

B. Facts regarding Failure to Investigate Completely

MQN argues that the insurer's investigation was incomplete and did not include adequate consideration of evidence that would support an inference that MQN had not engaged in fraudulent conduct.

An insurer may act in bad faith if it seeks to discover only

33

1  the evidence that defeats the claim and ignores supporting

2  evidence; the insurer has a duty diligently to search for

3  evidence that supports its insured's claim and should consider

4  all the information reasonably available to it at the time it

5  denied the claim for a basis upon which reasonably to deny the

6  claim. Mariscal v. Old Republic Life Ins. Co., 42 Cal.App.4th

7  1617, 1620 (1996). An inference of unfair dealing is appropriate

8  where an insurer fails to consider or to seek to discover

9  evidence relevant to the issues of liability and damages, such as

10  where the insurer fails to obtain all relevant records or

11  inexplicably relies on self-serving evidence while ignoring a

12  mass of other available evidence. Shade Foods, Inc. v. Innovative

13  Products Sales & Marketing, 78 Cal.App.4th 847, 880 (2000). It

14  has been held that where the insurer suspected insurance fraud in

15  connection with a claim regarding stolen property under a

16  homeowners policy, and thereafter criminal charges against the

17  insured were dismissed and the insurer was advised of the

18  existence of witnesses who had observed insured property in the

19  home of the insured, the insurer breached the covenant of good

20  faith and fair dealing when it failed to investigate.

21  Frommoethelydo v. Fire Ins. Exchange, 42 Cal.3d 208, 220 (1986).

22          1. Initial Investigation

23          It is undisputed that when the claim was reported to it,

24  AMCO assigned Chris Anderson to adjust the loss. Anderson, an

25  adjuster for Allied Insurance, testified that his job was to

26  inspect the loss and try to determine the amount of damages and

27  the facts surrounding a claim; the insurer needed to document

28  exactly what was damaged when the loss occurred; he documented a

property loss by visual inspection, taking photographs, and also
taking notes which, if important, were put into the paperless
computerized file of the insurer called "Passport." (Decl. of
Gonzalez, Ex. B, Dep. of Anderson pp. 10-15.) In his declaration,
he stated that it was his job to determine what MQN's claim was,
to learn the scope and extent of the loss, the dollar value
assigned by MQN to the loss, and to verify the loss. (Decl. p.
2.) He declared that it was not his job to determine whether MQN
was fraudulently inflating its loss; in the absence of any red
flags indicating the possibility of fraud, his job was simply to
determine how much to pay MQN and to pay it.

Akins testified that if he had investigated the damaged
product, he would have looked for evidence to substantiate the
claim of damage because in "any due diligent investigation" one
has a duty and responsibility to do that, to look for the
obvious. (Gonzalez Decl., Ex. F, Dep. of Akins p. 40-41.)

Anderson visited MQN's plant on August 14, observing smoke
damage on the interior walls and floor, water, some debris, and
product stacked outside in bins in a loading area. (Id. at 19-20,
33.) It was his job to take photographs of damaged product. (Id.
at 31.) He took photographs but did not recall what he
photographed. (Id. at 24.) Photographs taken by him that day did
not include photos of damaged product except for some chopped
almond product in process. (Gonzales Decl., Ex. D.) He could not
recall if he was shown all of the product, although he believed
he could have looked at it all had he chosen to do so; he
believed he inspected some of the product, although he thought,
but was not sure, that there was some that had been moved out to

1  a holding area or other building. (Id. at 25.) He spoke with

2  Grant Willits and Carmina Tapia. (Id. at 27.)

3      On September 9, Anderson returned to MQN and took additional

4  photos of allegedly damaged product that Anderson believed to be

5  at a warehouse and that was in boxes and bins. Anderson knew that

6  it was important for him as the claims representative to have

7  inspected the damaged product and to do a careful inspection to

8  satisfy himself that the product was actually in the building at

9  the time of the fire, and he did whatever he felt he needed to do

10 to satisfy himself that he had done that. (Id. at 53-54, 90-91.)

11 He saw the product but did not ask that any of it be moved or

12 opened up. (Id. at 52-53.) He did this in order to determine the

13 amount of product had been lost and to document the loss. (Id. at

14 51.) He could see the top layer of the boxes or bins, and he

15 could walk around three sides of the pile but could not get to a

16 fourth side that he believed was against a wall; some of the

17 bins' contents had soot or smoke damage, but he could not verify

18 that all of them had that damage, although he could not remember

19 if he saw any that did not. (Id. at 69-72.) He satisfied himself

20 that what he was looking at was actually in the building at the

21 time of the fire by visual inspection. (Id. at 89-90.)

22     Anderson's Passport notes, constituting entries into a

23 computer data bank of his notes and observations covering the

24 visit, indicated that based on the amount of work at the time of

25 inspection, it was clear that MQN had a large number of pounds of

26 nuts that were not sealed or covered that would account for the

27 loss of nuts in the fire; further, he stated that he had

28 inspected damaged nuts in a separate warehouse, and he

photographed all bins, bags, boxes, etc.; bins were stacked two
high in rows of ten or more; and based on the volume of the bins,
he visually verified at least 300,000 pounds or more of damaged
nuts. (Id. at 65-66.) He believed it to be accurate; he wrote
that the insured had provided a detailed inventory of pounds,
type and market price per pound of raw, processed, and finished
nuts. He also obtained more documentation of the values for loss
of product, which reflected pounds run per line each month in
2001 and 2002. (Id. at 66.) He declared that there were no red
flags in the first three months after the loss, and at least from
the insurer's point of view, the adjustment was proceeding
smoothly. (Anderson Decl. at 2.)

David Melton, a later adjuster, confirmed in his declaration
that there were no red flags during the first three months.
(Decl. at 2.) Reference to the Passport notes reveals that on
August 19, 2003, Anderson had been told by MQN that they were
collecting documents, and he informed them that they needed to
complete an inventory of all damaged goods; by August 28,
Anderson was informed by Grant, the plant manager, that they did
not have firm figures for the product loss.

Anderson testified that the case was reassigned from
Anderson to Dave Melton, a general adjuster who routinely handled
larger losses, after about thirty days. (Id. at 23.) In his
declaration, Anderson stated that on September 10, 2003, he was
no longer the primary adjuster, but he remained on the claim as
co-adjuster until October 29, 2004. (Decl. at 2.) Melton declared
that he worked on adjusting the claim from September 10, 2003,
until October 24, 2004. (Decl. at 2.)

Passport entries of Anderson and of David Melton, which were declared by Melton to be true and correct copies of relevant portions of the claims file, indicate that Melton and Anderson made various notations in the so-called "Passport" computer system, which are set forth at Gonzalez's Decl., Ex. A. (Decl. of Savage, Ex. 1, pp. 25, 53, 55.)[2] These include an entry of September 9, 2003, from David Melton, indicating that after talking to Anderson in depth about the file, Anderson had the file totally under control; he had obtained substantiated stock loss of $631,000 in nuts based on the weight and resale cost of nuts; Anderson had seen the damaged nuts being stored off site for salvage and could document the amount with records received by the insured and by his visual inspection of them. (Id. at pp. CLM-00001092.) Anderson's entry of September 9, 2003, indicated that based on the amount of work at the time of inspection, it was clear that they had a large number of pounds of nuts that were not sealed or covered, and that would account for the loss of nuts in the fire. He further noted that he had inspected damaged nuts in a separate warehouse; photos were taken of all bins, boxes, and bags; and the bins, stacked two-high in rows of

---

[2] The testimony of Anderson at deposition, authenticated by Savage's declaration and the title page and certificate of the deposition transcript, refers to pages 1093-95, 1099-1100, and authenticates them and arguably the remainder of the entries. Likewise, the testimony of Melton (Decl. of Gonzalez, Ex. C) and Anderson (Gonzalez Decl., Ex. B pp. 13-14) authenticates their passport entries. Akins testified that one working on a file should document activity done on the case in the Passport file. (Gonzalez Decl., Ex. F, Dep. of Akins pp. 30-31.) Further submissions by AMCO concerning Passport notes removes any doubt as to the authenticity of the Passport entries. If evidence is authenticated by one party, then it should be considered to be sufficiently authenticated against all parties, subject to the right of any party to present evidence to the ultimate fact-finder disputing its authenticity. Orr v. Bank of America, NT & SA, 285 F.3d 764, 776 (9th Cir. 2002).

ten or more, were visually verified to have been at least 300,000 pounds or more of damaged nuts, either raw unprocessed, partially processed (in machines at the time of fire), or finished nuts in open bins awaiting final packaging. Further, the insured had provided a detailed inventory of pounds of nuts, type of nuts, and market price per pound of raw, processed, and finished nuts. He noted, "Apparent that [the] amount of product lost is what they are claiming." (Id. at pp. CLM-00001093-94.) He had verified the amount of product produced per month by reviewing records from 2001 and 2002. Further, the insured had faxed a four-page inventory of all nuts with prices verified by market values that appeared to be in line for market values and pounds damaged. (Id. at CLM-00001095.) On September 10, 2003, an entry of David Melton indicates that the insured had documented the loss very well, and they could verify all the destroyed nuts as Anderson had seen and photographed them. (Id. at CLM-00001099.) On September 15, 2003, enough information had been received to post an accurate reserve. (Id. at CLM-00001100; Decl. of Savage, Ex. 1 at 86.) Anderson also testified that at the time he had no reason to disagree with the pounds of nuts claimed to be lost.

The reserve for stock damage was increased to $693,396.85 on September 15 according to Melton's Passport entry. (Decl. of Melton, Ex. 1 at p. CLM-00006286.)  Melton's entry of October 2 indicates that the insured had given a complete inventory of nuts. (Id. at CLM-00006292.) Melton reported on October 17 that he was going to talk with Paul Migdal from Greenspan, MQN's outside adjuster, in the following week to attempt to finalize the value of the nuts. (Id. at CLM-00006295.)

## 2. Allegation of Fraud

On November 10, 2003, Melton's entry indicates that he spoke with agent Joe Thacker, who had in turn had received a call from an ex-employee, a former office manager of MQN whose name was Sherry Pentorali. Thacker reported that Pentorali reported that Carmina [Tapia], the person in charge, had taken the loss and added items that were undamaged to list of damaged items, had taken stock from cold storage and put it in the damaged items when the previous adjuster inspected the damage, and had told factory workers to move the nuts with forklifts from storage and into the loss area and pack them in so that they would not be so noticeable; MQN was claiming that it was damaged when it was not but could not be sold. Pentorali expressed interest in talking to the adjusters; further, a woman named Rosemary who was still employed at MQN also knew about it and was really bothered; she had consulted an attorney who was threatening MQN to come clean, or he would take action. (Id. at CLM-00006295-96.) Melton agreed to contact the SIU (special investigations unit) regarding the matter. Russ Akins of SIU noted on November 11 that he was going to contact the witness and the employee to evaluate the information. (Id. at CLM-00006296.)

Russ Akins declared that AMCO assigned the claim to him in November 2003 to investigate Pentorali's allegations to determine in fact whether MQN had fraudulently exaggerated its claim. (Decl. at ¶ 4.)

## 3. Sherry Pentorali

It is undisputed that Akins learned from Pentorali on November 12, 2003, that Pentorali believed that there were two

large categories of product that MQN claimed were fire-damaged when they were not: fifteen bins[3] of finished and boxed almonds that had previously been rejected by the buyer, and eight bins of Brazil nuts.

Christopher Glenister, the CPA from Greenspan with whom Pentorali had initially worked in putting together the claim and evaluating inventory, testified that Pentorali disagreed with him about the measure of the value of some of the product; she disagreed with Glenister's use of a contractual provision that he understood to permit replacement of goods at the selling price if the goods had been sold but not delivered, and Pentorali instead believed that the claim should be limited to replacement cost. Glenister was critical of schedules that she had prepared. (Decl. of Savage, Ex. 2, Dep. of Glenister pp. 125.)

An excerpt from Valladares's deposition and additional documents referred to in part in the deposition provide an adequate foundation and tend to show that in 2003 Rosemary Valladares complained to Tapia of Pentorali's having engaged in hostile, angry, aggressive criticism of Valladares in front of others; Tapia instructed Pentorali in writing to conduct employee discipline or facts investigation in private and to treat the immigrant work force with respect, dignity, and courtesy. (Gonzalez Decl., Exs. P, Q.)

#### 4. Rosemary Valladares

Akins took a recorded statement from Rosemary Valladares on December 17, 2003 (Akins Decl., Ex. 3), in which Valladares

---

[3] It is undisputed that a bin contains approximately 2,000 pounds of nuts.

1   stated that 124 pallets of product in the plant at the time of

2   the fire had been repackaged and shipped to customers; only

3   twenty or thirty pallets had actually been lost; the product on

4   an Excel sheet of five or six pages, consisting of Brazil nuts,

5   almonds, and pumpkin and sunflower seeds, that had been

6   represented as having been in the plant at the time of the fire

7   and for which an advance had been made, was actually not in the

8   plant but had been in cold storage and other warehouses. In fact,

9   she stated that the more than 300 pallets on the Excel sheet

10  would not have even fit in the building. The Brazil nuts were

11  almost two years old and were thus a month away from being

12  useless or unsaleable. She had put documents that would reflect

13  her allegations on a disc and gave it to Akins; she downloaded

14  Grant Willits' photographs taken on August 12, early in the

15  morning before product was moved out of the burnt building; she

16  gave Akins hard copies of monthly inventories with tags that

17  would prove where the product on the Excel spreadsheet came from.

18  She also gave him shipping invoices of product sold to Todd

19  Winslow in September, but she was not involved in that process

20  even though she was still in logistics. She acknowledged that she

21  was not involved in taking the inventory taken immediately after

22  the fire.

23      Valladares stated that although she had worked at MQN since

24  May 2001 in accounts payable and then customer service in

25  logistics, she had been suspended for a disciplinary matter and

26  had retained an attorney to represent her; she had been accused

27  of destroying documents in connection with the fire. She had

28  confronted Willits and Tapia on September 15, telling them that

42

1   they should be behind bars. She had contacted an attorney, Steven

2   Derringer, in September, and asked that he expose the matter. She

3   admitted that she had taken documents out of MQN that she felt

4   were related to showing that something illegal was taking place.

5   She was removed from her logistics job on October 10 because

6   Tapia and Willits felt that she was not doing her job properly;

7   she was moved to the laboratory as a lab tech specialist, a job

8   about which she knew nothing. She further admitted that her

9   information that Tapia and Willits had orchestrated the

10  fraudulent inventory shifting had come from Ramon in inventory

11  control.

12       Akins testified at deposition that Valladares had told him

13  that Maria Elena Chavez had said that documents were being

14  removed from the lab and being destroyed by Grant and Carmina and

15  others; however, when Akins followed up and spoke with Chavez,

16  she could not substantiate that any of this was happening. (Decl.

17  of Davis, Ex. F, Dep. of Akins taken October 13, 2005 at p. 23-

18  24.)

19       Gordon Park testified that he had visited the plant;

20  although he originally had planned to have an engineer determine

21  if the amount of nuts claimed by MQN could have fit in the plant,

22  he determined based on his own observations and on diagrams of

23  the plant that there was room for the amount of nuts claimed.

24  (Decl. of Gonzalez, Ex. H pp. 64-66.) Testimony of Robert Buckert

25  of J-2 Engineering, a firm retained by Park, confirmed this.

26  (Decl. of Gonzalez, Ex. I.)

27       Akins testified that Valladares told him that she had erased

28  the hard drive on her computer; Akins' documentation of this

event included a statement of Akins that Valladares had told him that she copied the photos taken by Grant Willits on to her hard drive at work on the morning of August 12, 2003, sometime around 10:30 a.m. and later transferred them to a CD that she took home; Akins testified that she admitted that she had erased the MQN hard drive so that she had the only copies of the photos. (Decl. of Gonzalez, Ex. Z p. 34.)

Akins, a former police officer, considered potential bias of people making allegations and the presence of a motive, such as making up stories because of a beef against a person who is being accused; further, if he found out that part of what one told him was not true, it made him suspicious about the person and caused him to question their motives, their truthfulness, or the facts they have presented  (Gonzalez Decl., Ex. F (Dep. of Akins) at 15-17.) Further, Akins understood that people making accusations could have a financial incentive; he learned at some point that Valladares and a couple of other individuals had filed a lawsuit seeking $80,000,000 from MQN, which was a stronger incentive to verify independently whatever they said. (Id. at 21; Gonzalez Decl. Ex. S.) The plaintiffs in the Valladares action include Valladares, Ramon Delgadillo, and Hugo Perez; the date of filing is reflected as August 6, 2004. (Gonzalez Decl., Ex. S.) Akins recalled that there were people who disputed what Valladares said with respect to several incidents. (Id.) Park testified that he knew about the lawsuit before filing the present action. (Gonzalez Decl., Ex. H (Dep. of Park) at 39.)

Akins testified that in investigating, one tried to avoid leading questions in order not to put words into an individual or

1   to be the first person to suggest a particular topic or word;

2   further, it was possible that one answering a leading question

3   would simply be agreeing to the question without giving it enough

4   thought; however, sometimes they were used to prompt a reluctant

5   witness. (Gonzalez Decl., Ex. F (Dep. of Akins) at 60-61.) Review

6   of the questioning of Valladares by Akins on December 17, 2003,

7   reflects many leading questions. (Akins Decl., Ex. 3.)

8       Akins testified that before this lawsuit was filed, MQN

9   produced 30,000 pages of documents and never rejected any request

10  that he made to interview any witness; Akins visited the MQN

11  facility five times, including making one inspection. (Gonzalez

12  Decl., Ex. F pp. 53-54, 67.)

13      Akins declared that the allegations of impropriety were

14  particularly serious to AMCO because they were brought not only

15  by the possibly disgruntled ex-employee Valladares, but also by

16  Pentorali, a continuing employee. Akins declared that in his

17  experience, it was highly unlikely that a current employee would

18  make allegations of fraud against the employer because of the

19  fear of losing one's job. (Decl. at ¶ 9.) However, Passport notes

20  reveal that Thacker's first report to AMCO of Pentorali's

21  allegations recited that she was an ex-employee; her last day of

22  work was November 8, 2003, and it was on November 10, 2003, that

23  she contacted Joe Thacker. (Melton Decl., Ex. 1 at CLM-00006296;

24  Gonzalez Decl., Ex. R (Pentorali Dep.) p. 108, Ex. G (Lutkemuller

25  Dep.) p. 26.) Lutkemuller also testified that the call to Thacker

26  was from an employee of MQN. (Gonzalez Decl., Ex. G at 25.)

27                    5. Hugo Perez

28      Akins took a recorded statement from Hugo Perez, a forklift

                              45

operator for MQN, in January 7, 2004. (Akins Decl. ¶ 10, Ex. 4.)
Perez was twenty-one years old and had been terminated on
September 25 from his job as shipping and receiving clerk by
Lucio, his supervisor, for making a mistake in shipping out a
product. Perez believed that Lucio, and not Perez, was
responsible for the mistake. Being blamed for a mistake that he
believed was not his was a big deal to Perez. Perez had been on
duty at the time of the fire, had been one of the first employees
to discover the fire, was ordered home after firefighters
arrived, returned to work at noon, left and returned again at
five p.m., and confirmed that Grant Willits' photographs of the
scene generally reflected the plant as it had been at the time of
the fire. Perez explained that the stacks of nuts claimed to have
been damaged and shown to the adjuster on September 9 were put
together by Ramon. Akins stated that his information was that not
all of the nuts claimed to have been damaged were damaged, and
Akins further suggested that the shipping orders given with
respect to the salvaged product was "a little different" ( at
CLM-0000438); Akins also employed numerous leading questions.
Perez thereafter stated that he had loaded twenty-four bins of
mixed nuts that were allegedly damaged which included Brazil
nuts, and that at an unspecified time the Brazil nuts were in
cold storage and not in the front process area but were shipped
as salvage and fire-damaged nuts when Perez knew they were not
damaged. He also stated that the nuts were "not damaged, neither
by the fire nor rotten or any of that," (id. at CLM-0000440), and
he thought that someone was adding them on. He was instructed to
load them by Joe Lucio; Perez said he might have told Lucio two

1  or three times that the stuff was still pretty good, and Lucio
2  responded that they should do as they were told.

3              6. Ramon Delgadillo

4      It is undisputed that Valladares' reference to Ramon
5  Delgadillo caused Akins to interview Delgadillo on June 21, 2004,
6  which resulted in a recorded statement. (Akins Decl., Ex. 5.)
7  Akins again employed numerous leading questions. Delgadillo,
8  whose job was in inventory, was not working because he had
9  injured his back at work about three and one-half months
10 previously. When they had previously spoken (apparently in
11 January 2004), when asked who had instructed Delgadillo to mix
12 undamaged nut product that had been in cold storage with fire-
13 damaged nuts, Delgadillo had said that he could not remember
14 exactly; however, when asked in June, Delgadillo stated that
15 Tapia had gone to cold storage with Delgadillo and had pointed
16 out about ten pallets and boxes of Brazil nuts and some other
17 small pallets next to them that were not fire-damaged and
18 instructed him to move them to the warehouse and mix them with
19 the other nuts. He did not know when it was but then said it was
20 about two days after the fire. He knew at the time it was not
21 right. He also described the emptying of the burnt building on
22 the workday following the fire and the logging of the damaged
23 items, which took at least seven hours; Willits' instructions to
24 segregate and label the fire-damaged matter; the placing of the
25 emptied contents in a warehouse at Joe's instructions; the
26 placement of wrapped product from the burnt building into cold
27 storage; and Tapia's instruction a couple of days after that to
28 mix other nuts in with damaged nuts; another incident involving

                        47

twenty pounds of boxed sliced almonds from cold storage, although
he was uncertain about whether or not they were dumped into bins;
and he stated when prompted by leading questions that he knew of
other product that was in cold storage that was dumped into bins
and moved out, first Brazil nuts, then sliced almonds, and then
other miscellaneous bins; he did not know but speculated that
perhaps fifty or sixty extra bins were added to what had been in
the building. He also described how the bins were stacked double
high for the adjusters, and Grant Willits told him to put the
dirty nuts or nuts in sooty boxes on the outside where they could
be seen by the insurance adjuster and to put the nuts from cold
storage on the inside. Delgadillo complied and then went to talk
to Rosemary to tell them that it was not right. He had never
talked to Grant about this; he talked to Joe Lucio, who
instructed Delgadillo to tell the truth if someone from the
company asked him about whether or not he had seen Brazil nuts in
the production area at the time of the fire. Delgadillo also
loaded trucks that were for Todd Winslow, the salvage purchaser;
some of it was really old product that had been in the warehouse;
some was dirty and was from the fire; some had worms "and stuff,"
(id. at CLM-00001254), and some of it was good stuff. Not all of
what Winslow took was in the fire. Delagadillo was uncertain
about the packaging and status of the Brazil nuts.

### 7. Janette Zamora

It is undisputed that Akins interviewed Janette Zamora,
whose recorded statement from June 17, 2004, appears as Exhibit 6
to Akins' declaration. Zamora when interviewed was a production
clerk and had worked at MQN for nine years; Rosemary Valledares

48

was also present for the interview for Zamora's comfort. Zamora stated that she believed that her job would be in jeopardy if the employer knew that she was talking with the insurance investigator. Many leading questions were employed by Akins. Zamora stated that as a production clerk she reported all input and output tags on product, recording them on a work order and sending them to the office to be entered into the system. To trace what was being processed at any given time, one would review a lab record, which would show what was finished on a particular shift; Zamora's work order paperwork on what was finished and recorded; paperwork for two or three days back for production; and shipping records from the office to show what was actually shipped. Zamora worked on the night of the fire and the following day, and she would know what product was in the building at the time of the fire, and the Brazil nuts and almonds were in cold storage but not in the plant where the fire occurred; even if the Brazil nuts were being tested, they would be tested outside the burnt building and thus would not have been damaged by fire. Nine bins of Brazil nuts could not have fit into the building. Fifteen bins of blanched almonds were not in the building at the time of the fire; they were in cold storage.

Zamora commenced her shift at 1:30 p.m. on the day after the fire, and the plant was empty and was being cleaned; the things inside during the fire had been moved out to the back and possibly to other warehouses. People cleaning up that day got very dirty and black; a picture of Marescella Mendoza taken by Grant Willits showed Mendoza, who looked dirty, but Zamora stated that Mendoza was even dirtier than that at the end of the day.

1   Keith told Delfina to keep track of everything damaged, and

2   Zamora observed that it was being logged. She observed photos

3   taken by Grant Willits and remembered that they reflected the

4   plant as she saw it then except for some product that was double-

5   stacked, although they could have been stacked there during the

6   move of products out of the burnt building after the fire.

7   Various employees, including Kimberly Delgadillo, had heard

8   rumors regarding extra product being mixed in the damaged goods

9   or anticipated bonuses; Zamora herself observed Grant direct

10  Ramon to load things to be sold to Todd Winslow, and Ramon told

11  her he did not think it was right. She testified at her

12  deposition in October 2005 that she had told the truth during her

13  interview and that she did not lie. (Park Decl., Ex. 7.)

14      Because of Zamora's job duties and her presence in the

15  production line the night of the fire, personal knowledge as to

16  the absence of the Brazil nuts and almonds in the building that

17  burned on the night of the fire has been established. The Court

18  has not considered any statements of Zamora regarding rumors or

19  Herring's boasting of bonuses for the truth of the matters

20  asserted.

21              8. Todd Winslow

22      Akins spoke with Todd Winslow, the person who bought the

23  salvaged product, on December 3, 2003. (Akins Decl., Ex. 3  p.

24  CLM00006298.) Winslow had received twelve truckloads; there was

25  no discussion of the condition of the nuts. (Id.) On December 10

26  and January 29, Akins received documents from him. (Id. at p.

27  CLM000006299; Ex. 2 p. CLM00006307.)

28      It is undisputed that Akins interviewed Todd Winslow, the

person who bought the allegedly damaged nuts as salvage. (Akins Decl. ¶ 13, Ex. 7.) The interview occurred on February 20, 2004, and was recorded. (Id.) Winslow, who had owned a concern that was a forerunner to MQN but no longer had any financial interest in it or MQN, and who had been in the nut business for fifteen years, stated that he bid on the fire-damaged product after inspecting it at MQN's dry storage building while it was stored in fiber totes in double stacks; he inspected only the single stack, opened the ones that he could, and agreed to purchase 262 bins initially but then was given more product. He first looked at the material after purchase when it was stored at Waterford Nut's parking lot; some exhibited water or soot damage; in other product he found quite a bit of meal, which he could not use for his intended purpose; he was surprised that a lot of the material exhibited webbing, which was evidence of insects, inside the bin and on the top of the product, and he found live worms; he also found flyers, or moths, which indicated three stages of infestation. The Brazil nuts had a rancid taste; Winslow believed that they were old. Winslow had to have every bin fumigated to protect nearby product belonging to third parties whose parking lot he was using for temporary storage of the product. Several weeks appear to have passed between delivery of the product to Winslow and the completion of Winslow's inspection in the parking lot after fumigation. Winslow believed that the product had been misrepresented, although he did not confront MQN; he was being used, and he took it on the chin. Some of the product was still in Winslow's possession at the time of his recorded statement. Winslow stated that the full amount of product was not reflected

1    in bills of lading confirming what he had bought; he had to

2    obtain them from Randy Robertson. His check for the salvaged

3    product was dated January 22.

4         Passport notes reveal that on March 1, 2004, Akins obtained

5    twenty photos from Winslow of 14 of the 305 bins purchased that

6    had contents of product, floor sweep, milled product, mixed

7    product, whole and diced almonds, various debris, and nut shells,

8    which Akins or Winslow concluded would not have been in the

9    processing area; further, it did not appear to be fire-damaged.

10   Akins also received four bags of samples containing finely ground

11   nut meal, almonds, roasted almonds with debris and parts, and nut

12   meal and balled up product. (Akins Decl., Ex. 2 pp. CLM00006311.)

13        On August 10, 2004, Akins' Passport notes reveal that

14   Winslow called and advised that Brazil nuts and almonds that were

15   old but not fire-damaged had been soled profitably; he estimated

16   he had over 60,000 pounds of this product. (Id. p. CLM00006322.)

17        The Court does not consider as established fact the

18   conclusion of Winslow that an infestation of insects occurred at

19   any particular point in time or space; there is no showing of

20   personal knowledge or sufficient basis for such an opinion. The

21   Court notes only that such a conclusion was made.

22        Excerpts of a statement of Grant Willits (Decl. of Davis,

23   Ex. A) are, according to attorney Jeffrey P. Davis (Decl. of

24   Davis ¶ 2), from a statement taken under oath. There is a date of

25   April 5, 2004 on the excerpts; however, it is not clear who took

26   this statement and under what circumstances; there is no

27   certification of a reporter or other indication of an oath and

28   accuracy of the transcript. AMCO's waiver of foundational

objections extended only to deposition testimony; AMCO objects to the form of the testimony and asserts that it is unsworn matter. A deposition or extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent. Fed. R. Evid. 901(b); Fed. R. Civ. P. 56(e) & 30(f)(1); Orr v. Bank of America, NT & SA, 285 F.3d 764, 774 (9th Cir. 2002). Where a reporter's certification and the names of the deponent and the action (i.e., the cover page of a deposition and the reporter's certification) are missing from a transcript or excerpt therefrom, an attorney's affidavit identifying the names of the deponent, the reporter, and the action, and his or her further statement that the exhibit is a true and correct copy are not sufficient to authenticate the document even where the attorney-affiant was present at the deposition. Orr v. Bank of America, NT & SA, 285 F.3d 764, 774 (9th Cir. 2002) (citing Pavone v. Citicorp Credit Servs., Inc., 60 F.Supp.2d 1040, 1045 (S.D.Cal.1997)). Using the analogy of a deposition, it must be concluded that there is inadequate foundation for the excerpts. Therefore, the Court does not consider the statements of Willits regarding where and how the damaged product was located and stored in the weeks after the fire and before Winslow purchased it.

Further, the Court concludes that MQN has failed to provide evidence warranting an inference that particular storage conditions, whether at MQN's facility after the fire or while in Winslow's custody, resulted in infestation by Indianmeal moths.

Deposition testimony of Winslow in the <u>Valladares</u> action (Decl. of Davis, Ex. B) shows that he initially received about fourteen trucks of the product from MQN; some arrived on September 10 and stayed in the parking lot for about two weeks; the last product arrived about September 23; then it was all fumigated about a week later, and then another week passed before the product could be inspected. However, even though there is evidence of about a month of storage in a parking lot, the Court sustains the objection of AMCO to the evidence regarding the possibility of infestation by a specific insect. All that is presented is articles concerning the insect, which constitute hearsay; further, there is no evidence that the particular infestation of the salvage nuts was Indianmeal moths, and thus the evidence is irrelevant. AMCO's objections are sustained.

Erich Lutkemuller, who decided to file AMCO's suit, testified that smoke damage to a nut is not always visible to the eye, so merely looking at the allegedly damaged nuts might not have determined whether there was water or soot damage; however, whether the nuts were damaged by smoke could have been determined both visually and by taste. If AMCO had obtained samples from Winslow's concern, Creative Ingredients, it seemed to Lutkemuller that one thing AMCO could have done was to have retained a consultant to do sampling or testing to see whether the nuts had been damaged (Decl. of Gonzales, Ex. G at 41, 45).

Melton testified at deposition that after he heard about the allegation of commingling of undamaged and damaged nuts, he made no effort to locate the product to inspect it to see if undamaged nuts were included in the product because it was not his job; it

54

was the job of the SIU. (Decl. of Gonzales, Ex. C, p. 22-23.)

Akins testified that he first knew that the product had been sold to Winslow's Creative Ingredients entity when he conversed with Shery Pentorali regarding Brazil nuts, but he did not send anyone out to reinspect the product because he thought that he had contacted Winslow, and some of the product was already gone; he did not inquire about what was left; he did not know if any of the product was still there (with Winslow), although he also testified that he might have asked Winslow in some conversation if the product was still available, but it had all been moved to a storage yard up north; however, he also testified that when he talked with Winslow, he could have inspected the nuts. He had no specific recollection of having asked to inspect the product. As a former police officer, he opined that it was generally better to see evidence as soon as possible. (Decl. of Gonzalez, Ex. F. Dep. of Akins p. 43-48.)

Gonzalez declared that he had reviewed the Passport computer file produced by AMCO and had not found any entry where anyone from AMCO asked to reinspect the product after learning of the alleged fraud, or any entry indicating that Winslow hampered any effort by AMCO to reinspect MQN's product. (Gonzalez Decl., ¶ 31.) The Court overrules AMCO's objections of lack of foundation and hearsay; it appears that Gonzalez is referring to a specific Passport computer file produced in discovery and that he had personal knowledge of the contents of the Passport file that he reviewed. Further, the Court overrules AMCO's objection of irrelevance because the evidence has some tendency to show that AMCO failed to seek to reinspect any product that remained under

1 Winslow's control, and thus it bears on the nature of the

2 investigation undertaken by AMCO.

3                9. <u>Records</u>

4       AMCO asserts that MQN failed to provide business records

5 concerning the days before, on, and after the fire that MQN

6 regularly kept that would have identified the precise product in

7 the burnt building at the time of the fire, including daily

8 handwritten lab reports, a lab book recording all lab testing

9 requests and test results, forms normally generated when fatty

10 acid tests were performed, the weekly production report, the

11 daily shipping schedule, and a videotape from a surveillance

12 system designed to ensure product safety. AMCO cites to

13 allegations in Akins' declaration (¶¶ 15-20) that with respect to

14 such highly probative information, MQN has repeatedly advised

15 Akins that the documents are missing and cannot be found;

16 further, MQN has repeatedly advised Akins that the video system

17 was apparently not recording on the day of the fire. No detail

18 with respect to Akins' queries and MQN's assertions is given;

19 further, the precise date or dates of the documents sought are

20 not stated. No supporting documentation of this communication is

21 pointed to by AMCO.

22       MQN disputes Akins' assertions and submits the declaration

23 of Davis, in which Davis specifically declares that multiple

24 pages of such documents, and others, pertaining to the day of the

25 fire and the relevant time period have already been produced in

26 discovery, and he identifies the Bates page numbers of such

27 production; he also explains that in April 2004 MQN produced a

28 statement of Willits that the fatty acid test results were not

1   being retained at the time of the fire (Davis Decl., Ex. E).

2   Further, he attaches in Exhibit F deposition and EUO transcripts

3   (it is not clear which is which) that tend to show that the

4   weekly production report was not a static document but was rather

5   continually overwritten.[4] No adequate basis for inferring

6   personal knowledge on the part of Davis with respect to the

7   record-keeping practices of MQN at the time of the fire has been

8   set forth; however, from Davis's summaries and charting of

9   various documents, including production and shipping documents,

10  it appears that Davis was familiar with numerous types of

11  documents generated at MQN and with their function. Thus, Davis's

12  declaration tends to establish that various documents have been

13  produced, and that these documents are responsive to discovery

14  requests for such documents; however, neither Davis nor Akins

15  specifically details evidence from knowledgeable sources within

16  MQN concerning the records kept by MQN or the exact source and

17  function of any particular documents.

18      The Court has not been pointed to sufficient evidence, as

19  distinct from conclusions, to warrant an inference that Akins had

20  personal knowledge that such documents, or even documents that

21  were functionally equivalent to such documents, were kept in the

22  ordinary course of business, were highly probative, were or were

23  not produced, or that specific documents were missing, as

24  distinct from not ever having been in existence. The true status

25  of MQN's documentation of production and the insured's

26

_____

27      [4] The objections of AMCO initially relate to inadmissible deposition
    testimony not before the Court (Objs. p. 6); thus, it appears that the matter
28  is from depositions, and thus that the foundational objection is waived by the
    later waiver of foundational objections to deposition excerpts.

1   cooperation with respect to such documentation during the

2   insurer's investigation is not discernible based on the limited

3   argument and evidence submitted by the parties. It is sufficient

4   to conclude at this point that the parties dispute these matters.

5   The Court will not scour the materials submitted to try to piece

6   together a foundation or a context in which to draw inferences

7   beyond this conclusion. Given the generality and conclusory

8   nature of Akins' factual assertions and the absence of a showing

9   of personal knowledge on his part with respect to MQN's process

10  of documentation, and further considering the specificity of

11  Davis's assertions regarding production of documents meeting the

12  description set forth by Akins, the Court concludes that there is

13  an issue of fact as to whether or not the documents actually

14  exist and whether or not MQN has actually claimed that documents

15  are missing or has failed to provide particular documents.

16      With respect to the videotape, it appears that MQN through

17  its counsel informed Park by letter in October 2004 that MQN

18  asserted that the videotape was not recording on the day of the

19  fire (Decl. of Davis. Ex. C); further, Akins declares that MQN

20  advised him that it was not recording on the day of the fire.

21  Although, as AMCO objects, this letter and Davis's declaration on

22  this subject appear to be hearsay and not based on personal

23  knowledge, the letter may nevertheless be used to show that MQN

24  stated that position. It is not clear that Akins had personal

25  knowledge of the alleged purpose of the system (which he states

26  was to ensure product safety) or of its customary or actual

27  operation. Park testified that he had seen the machine but had

28  not seen any actual taping or tape used to record activity in the

plant, and no one had ever told him that there were any such

tapes. Indeed, it was represented to him that MQN had no tapes.

(Gonzalez Decl.,Ex. H, Dep. of Park, p. 79-80.)

### 10. Photographs

AMCO asserts that in his examination under oath taken on

April 15, 2004, Willits misrepresented the condition of the plant

and the coverage of the photographs he took on August 12, the day

after the fire.

Keith Herring testified that on August 12, the day after the

fire, they could not re-enter the building until after the

structural engineer and fire marshal approved. (Gonzalez Decl.,

Ex. U p. 32.)

Reference to the transcript of the examination under oath

(Decl. of Park, Ex. 1 (EUO of Grant Willits)) reveals that

Willits stated under oath that around 8:30 a.m. on August 12, the

fire department gave the o.k. to re-enter the building (id. at

42), which was dark because the power was off; Willits was last

in the plant at 4:00 o'clock on the day of the fire; he was not

sure when he started taking his photographs the day after the

fire, but it was in the afternoon, maybe approximately at 4:30,

and by that time quite a bit of the product had been taken out

and put in both warehouses and the parking lot between the

warehouses (id. at 42-43, 165-66).

Akins declares (Decl. ¶ 21) that it is plain from the face

of the photographs produced by Willits in the course of his EUO

that they were taken when there was no artificial lighting set up

in the plant; therefore they were taken before 12:00 p.m. and

thus were taken before a huge quantity of nuts could possibly

have been removed from the plant (id.). Reference to the photographs (Park Decl., ¶ 8, and Ex. 2 (photos)) reveals a number of photographs depicting a dark subject, but whether the darkness is due to lighting conditions or the operation of the camera is not clear. Further, as MQN notes, this evidence does not establish the purported time of 12:00 for bringing in artificial lighting. Excerpts of the examination under oath of Darren Anderson (Park Decl. ¶. 10, Ex. 4) reveal that the plant was dark until generated lights arrived, and Anderson was "just guessing" when he opined that the generated lights were in "over there" by about noon, (id. at 82-83). No data are provided with respect to the size, location, or strength of the lighting that was provided. The Court concludes that there is not a sufficient context for an inference regarding when the lights were provided or when the photographs were taken; thus, the further inference that Willits lied about when the photographs were taken is not warranted from this evidence.

AMCO points to the statement of Zamora to the effect that all the fire-damaged nuts were removed from the plant when she arrived to work at 1:30; inside the plant was empty, and employees were cleaning it. (Akins Decl., ¶ 12, Ex. 6 at CLM00001218-19). Further, Zamora stated under oath that a picture of employee Marisela or Marescella Mendoza reflected in one of Willits' photographs showed Mendoza dirty but not as dirty as she was at the end of the day. (Akins Decl., Ex. 6 p. CLM00001230-31.) AMCO asserts that Mendoza left work at 1:30 p.m. that day. However, Davis declares that Mendoza's time sheet for that day (Davis Decl. ¶ 12, Ex. J) reveals that she clocked out at 2:32

p.m. AMCO objects on the basis of hearsay and irrelevance. The foundation for this document is uncertain, but even assuming that from context it could be authenticated and treated as a business record, it would establish only a record of the time she clocked out, and not necessarily when she left the plant. The statement of Zamora regarding Mendoza already being dirty but having become even dirtier by the end of the day is imprecise with respect to degree of dirtiness and time, and thus does not support a clear inference one way or another with respect to a misrepresentation by Willits regarding the time of the pictures.

AMCO points to the recorded statement of Maria Chavez taken on February 20, 2004, which appears to have been translated as well (Akins Decl ¶ 14, Ex. 8), in which Chavez, a lab technician for MQN, stated that she had worked on the second shift, was sent home on the night of the fire, and returned to work the next day at 2:30, her usual time; she was instructed to help Ramon and Hugo put papers that said "fire damaged" on bins that were right outside or on the loading dock but were supposedly inside when the fire occurred; and by that time, the product that she was told had been in the processing building at the time of the fire had been moved outside already, and there was nothing left in the building. Assuming that she was inside the building and thus had the opportunity to observe what was in the building, her testimony reflects that the usual starting time of the second shift was 2:30, and thus tends to conflict with Zamora's testimony on that point regarding arriving to work at 1:30 for the beginning of the second shift. Considering the conflicting evidence of the time that employees' second shift began, and

1 further noting the uncertainty of Willits' testimony, an

2 inference that Willits was mistaken or unsure is as reasonable as

3 an inference that he lied.

4      Gonzalez declares that Exhibit T to his declaration is a

5 copy of a page from a SIU report prepared by Akins that was

6 produced to MQN by AMCO in this litigation, which identifies

7 twenty-nine photographs taken by Mike Loughney from Olsen

8 Construction on the day after the fire between noon and 2:00 p.m.

9 (Decl. ¶ 71.) Insufficient indicia of authentication are provided

10 with respect to this document.

11      AMCO's objections of hearsay and improper foundation to

12 excerpts of statements taken under oath of Darren Anderson

13 (Gonzalez Decl., Ex. V) and Joe Lucio (Gonzalez Decl., Ex. W) are

14 sustained. Likewise, AMCO's similar objections to Exhibit X,

15 purporting to be a time sheet from MQN for various days,

16 including August 12, 2003, and to Exhibit Y, purporting to be an

17 excerpt from the statement under oath of Tapia, are sustained.

18           11. <u>Forensic Accountant Susan Thompson</u>

19      AMCO points to facts assertedly established by the report of

20 Susan Thompson, a forensic accountant and Litigation and Forensic

21 Services Director of Hemming Morse, Inc., which is prefaced by

22 her declaration, in which she states that she has personal

23 knowledge of facts set forth in the declaration. She declared

24 that she had examined thousands of documents produced by MQN,

25 including lab reports, and consulted with many employees,

26 including President Carmen Tapia, and reached conclusions stated

27 in her report. Thompson rendered a report to Gordon M. Park on

28 October 22, 2004 (Decl. of Thompson, Ex. 1). Her report was

1   premised on MQN's being able to track inventory from the time it

2   was delivered to MQN and through the processing and packaging

3   stages; another assumption was that nuts were processed to fill

4   current orders and were not generally kept in the plant (as

5   distinct from cooled or cold storage) until processing because

6   rancidity, infestation, and overall quality could be affected by

7   not keeping the nuts cool. (Id. at CLM-00005146-47.)

8       Her method included obtaining customer contracts for all the

9   inventory in the processing warehouse at the time of the fire

10  (which she admitted she did not do because she stated that they

11  had not been produced), determining whether or not the inventory

12  claimed as damaged likely existed in the production warehouse at

13  the time of the fire, and analyzing the values used for

14  replacement cost for damaged inventory. (Id. at CLM-00005147-48.)

15  Analysis of inventory records for the end of July, daily

16  production documents, and bills of lading indicated discrepancies

17  between the product on hand at the time of the fire and the

18  amount claimed as damaged; reference to an inventory history

19  listing discussed with Tapia resolved some discrepancies but left

20  many unresolved. Thompson concluded that it was suggested that

21  the amount of damaged nuts sent to the salvage company might have

22  been overstated because when the inventory sent to salvage on

23  September 24, 2003, was deducted from the inventory history

24  listing, a negative balance on some products was left, which

25  required adjustments by the insured to remove the negative

26  balance; the adjustments made were not related to producing or

27  selling the product, and the insured was unable to provide an

28  adequate explanation.

1    Thompson reported to Park that consideration of the physical

2  inventory tags from the end of June, July, and August 2003

3  revealed that many items were located in the same or various

4  warehouses for the two months preceding the fire; physical

5  inventory tags, daily lab sheets, and material list log sheets

6  revealing input and output reflected that inventory on the proof

7  of loss was not processed in the first few days of August, but

8  was simply moved from one location to another. The amount of

9  inventory claimed by the insured to have been moved into the

10  production warehouse between August 1 and August 11 equaled

11  277,341 pounds, or 78 per cent of the total pounds claimed on the

12  proof of loss. Of this amount, Thompson concluded that

13  approximately 13,846 may have been moved to the processing

14  warehouse after the June 30 physical inventory was taken and

15  before the fire. Thus, a portion of the inventory could have sat

16  in the uncooled processing warehouse for as much as five weeks

17  without being processed. Further, moving 277,341 pounds of

18  inventory in a short period of time without contracts that show

19  that processing was necessary to fill their customer orders was

20  not consistent with MQN's practice of processing to fill orders

21  and would compromise the quality of the product. Further, daily

22  lab sheets permitted her to identify 79,416 pounds of inventory

23  listed on the proof of loss that was in production between August

24  1 and August 11, 2003 and thus likely to be in the warehouse.

25  This would equate to 40 pallets of product, assuming 2,000 pounds

26  per pallet (which could have been too high); however, the proof

27  of loss contained approximately 178 pallets, or 356,487 pounds.

28  Further, inventory with manufacture dates after August 11, 2003,

1  equaled 35,153 pounds or $59,806 in the proof of loss, but

2  Thompson concluded that inventory processed after the date of

3  loss clearly should not be included in the insured's claim.

4      AMCO asserts that the lab reports provided by MQN to AMCO

5  showed that about 20,210 pounds of nuts were in the facility at

6  the time of the fire. The citation is to Thompson's declaration,

7  which does not mention lab sheets, and to two pages of exhibits

8  to her report, which, pursuant to headings, consist of a costed

9  inventory report of unstated date and a summary of tags found in

10 lab sheets of inventory likely to be in the production area at

11 the time of the fire. It is unclear how the components of the sum

12 were selected or how the exhibits demonstrate the reported

13 amounts. Further, as MQN points out, AMCO's own evidence, in the

14 form of Thompson's report, indicates that using the daily lab

15 sheets, accountants were able to identify 79,416 pounds of

16 inventory listed on the proof of loss that was in production

17 between August 1 and August 11, 2003, and thus was likely to be

18 in the processing warehouse. (Decl. of Thompson, Ex. 1 at CLM-

19 00005150.)

20     It appears to be undisputed that, as alleged in MQN's

21 complaint, MQN's claim was for 356,487 pounds of nuts.

22     AMCO claims that MQN in turn claimed to have moved 297,336

23 pounds of inventory into the processing plant in the week before

24 the fire. The evidence cited is an exhibit to the Thompson

25 declaration (Ex. 1, schedule 1), which is a costed inventory

26 sheet and a summary of tags found in lab sheets for manufacturing

27 dates spanning from mid-July through August 11, 2003; it is not

28 immediately apparent how this documentation establishes the claim

of AMCO that MQN in turn claimed to have moved the inventory; it appears to be a conclusion based on the investigation of Thompson.

AMCO asserts as facts the conclusions of Thompson reached in her report of October 22, 2004, including that a review of physical inventory records revealed discrepancies between the amount of product on hand at the time of the fire and the amount claimed as damaged; the physical inventory records and contracts for product then in hand demonstrated that it was unlikely that there was as much product in the processing plant at the time of the fire as claimed by MQN; the number of pounds of product claimed by MQN to have been fire-damaged had not been substantiated by the insured; and she was unable to verify the reasonableness of certain aspects of the insured's claim, including the replacement cost of product, the cost of finished goods packaging materials, saved expenses that might apply to claims for extra expense, and loss due to business interruption.

MQN objects to the use of the conclusions reached in Thompson's report via her declaration that simply states that the facts in the declaration are true and that she reached conclusions set forth in her report; MQN notes that cross-examination of Thompson at her deposition with respect to the basis for her opinion was foreclosed by AMCO (Gonzalez Decl., Ex. K at 66-69).

This evidence tends to show that as of the time Park

received Thompson's letter of October 22, 2004,[5] there was an
opinion which, if not biased and if rendered pursuant to
acceptable standards and on the basis of complete information and
adequate documentation, provided a basis to believe that the lab
reports reflected fewer nuts in the facility at the time of the
fire than were claimed on the proof of loss. Based on the
declaration of Thompson, the Court apprehends the conclusions
stated in the report; however, the Court cannot thereby find that
the conclusions were reasonable or otherwise evaluate the
accuracy of the basis or methodology of Thompson's conclusions.
The declaration merely establishes that conclusions were made by
Thompson in a report after an investigation.

AMCO asserts that MQN was unable to explain why it moved
297,336 pounds of inventory into the processing plant in the week
before the fire. The examination under oath of Keith Herring
(Park Decl., Ex. 3) indicates only that Herring did not know why
production tags with numbers higher than the last finished tag
put on product on the date of the fire could have been in place
at the time of the fire; however, it also demonstrates that
Herring stated that he did not have anything to do with the
tagging. Without further context, it is difficult to infer from
the testimony of one person that the entire entity of MQN was
unable to explain why the inventory was moved, if it was moved.

Gonzalez declares that he had discussed Thompson's report
with experts and concluded that it was very vulnerable to attack;

---

[5] The date of receipt is unclear; further, the Court again notes that
the instant lawsuit was filed on October 26, 2004, and the letter to AMCO from
counsel regarding his recommendations on the claim and litigation was dated
November 22, 2004.

MQN would be able to establish that there was no foundation for
her assertions and that no reasonable person would rely on that
report as a basis for filing a fraud claim. (Decl. ¶ 55.) AMCO's
objection on the basis of lack of foundation and improper
conclusion is sustained.

Glenister, the outside adjuster/accountant working on the
claim for MQN, testified that he believed that Thompson's
conclusions were incorrect, and he did not agree with all of her
methods. (Gonzalez Decl., Ex. O p. 26.) Thus, the conclusions in
the report and its methodology are disputed by someone with
expertise in the field and specific knowledge of the matters
evaluated by Thompson.

C. Analysis of Whether the Investigation Was Complete

That AMCO conducted an investigation and what various
persons stated to AMCO in the course of that investigation are
largely undisputed. It must be determined whether there are
conflicting inferences as to the reasonableness of the insurer's
denial of the claim based on the investigation. In making this
determination, this Court is required to draw any reasonable
inference in MQN's favor.

As to much of the information gathered, it is possible to
draw conflicting inferences regarding the reasonableness of
relying on it. Pentorali was an ex-employee who had been
disciplined in 2003 by Tapia; further, she disagreed with
Glenister, the outside adjuster, who had been critical of her
schedules. Thus, it may be inferred that she was biased.

Rosemary Valladares admitted that she stole documents,
including Willits' pictures, and then erased her had drive at

68

1  work so that she would have the only copies; and she suffered a

2  disciplinary suspension for her stealing or destruction of

3  documents. Chavez disputed Valladares' story that Chavez had made

4  statements about documents being removed and destroyed; and

5  others had disputed what she had said regarding several

6  incidents. Further, Valladares' information had to do with the

7  contents and placement of bins, and yet Park himself determined

8  that she was wrong with respect to whether or not all the claimed

9  bins would fit in the building that burned. Finally, she was a

10 plaintiff in the lawsuit against MQN. It may reasonably be

11 inferred that she was biased and unreliable or untrustworthy.

12      Likewise, Hugo Perez, who visually determined that twenty-

13 four bins of nuts that he loaded were not fire-damaged or rotten,

14 believed that he had been fired unfairly because of the mistake

15 of his supervisor, and he was a plaintiff in the suit against the

16 company; it may be inferred that he was biased. Further, a

17 rational trier could conclude that a determination of the

18 condition of the nuts based on a visual inspection alone was not

19 reliable or reasonable. Ramon Delgadillo, who stated that a

20 couple of days after the fire he moved from cold storage ten

21 pallets of Brazil nuts that he apparently determined by visual

22 observation alone were undamaged, was unable to remember closer

23 to the time of the incident some key details, such as who

24 instructed him to mix the nuts inside the display; however, he

25 remembered six months later that it was Tapia, and it was Willits

26 who told him to mix the undamaged nuts on the inside of the

27 display for the adjuster. Further, he was a plaintiff in the

28 lawsuit against MQN. Again, one possible set of inferences is

that his information was unreliable or untrustworthy and that he himself was biased.

There was the statement of Zamora, who remained an employee and who as a production clerk claimed to know that the Brazil nuts and almonds were in cold storage at the time of the fire. The reliability of her information might be questionable in view of the fact that she also claimed that nine bins of Brazil nuts would not have fit into the burnt building, which appears to have been known to Park to be untrue; and her statement conflicted with Chavez's as to the time the second shift started. It is possible to infer that her information was not completely reliable or was at least subject to question.

Winslow believed that he had been disadvantaged or defrauded in the course of his purchase of MQN's salvage nuts, and thus, it could be inferred that he was biased. His statement that a substantial quantity of the material he bought was not fire-damaged is of questionable validity because his method of inspection (merely visual or otherwise) is not ascertainable. It is not clear that there is a reliable basis for this conclusion in the record in light of Lutkemuller's testimony that a mere visual inspection might not be sufficient to ascertain whether or not product was fire-damaged.

The proposition that MQN destroyed or failed to produce specific records that were known to have existed has not been demonstrated to have been based on sound data. It appears that AMCO asserted that MQN destroyed or failed to produce videos, but it does not appear that there was any evidence to support such an inference; indeed, inferring that video tapes were routinely used

70

for surveillance, were in use at the time of the fire, and were not produced, were destroyed, or were otherwise made unavailable to AMCO appears to have been based on no evidence at all other than the observation of AMCO's agents that cameras were in the building. A rational trier of fact could conclude that AMCO's conclusion in this regard was unreasonable; indeed, a trier could conclude that it also suggested that the investigation was biased.

The pictures taken by Willits appear to have been removed by an ex-employee; the evidence regarding the time the pictures might have been taken is in conflict; and Willits was uncertain as to the time the pictures were taken in the afternoon. Under these circumstances, a reasonable trier of fact could conclude that the conclusion that Willits was lying, as distinct from being mistaken, about the time that the pictures were taken was unreasonable.

The insurer relied on a forensic accountant, which would otherwise warrant an inference of a diligence and reason on the part of the insurer with respect to examination of the documentary evidence.[6] However, as is discussed below, a rational trier could nonetheless infer that Thompson was biased, that the insurer consciously chose an investigator who was not independent or objective, and that Thompson, at the direction of AMCO or its counsel, engaged in unethical behavior and misrepresentation with

---

[6] However, the Court notes that even absent the other problems with Thompson's portion of the investigation, Thompson's report was transmitted in a letter dated October 22, 2004, three days before the date of filing the instant action. It is unclear when the report was received. A rational trier might question whether it was relied upon by AMCO in determining its position on the claim.

1  the insured. This permits an inference that the process of

2  reviewing the documentation was not independent or reliable but

3  was in fact pretextual, unfair dealing, and that the insurer thus

4  did not perform a complete or reasonable investigation with

5  respect to the documentary portion of the claim.

6      Further, the Court notes that the conclusions of Thompson

7  are shown to be based on a methodology that was disputed by

8  another expert.

9      Finally, numerous facts concerning the overall performance

10 and methodology of the investigation might warrant a rational

11 trier of fact in inferring that the investigation was not

12 thorough or reasonable. Anderson purported to be charged with the

13 task of verifying the loss, and yet he did not examine a

14 substantial portion of the nuts even visually; indeed, he did not

15 know what he could have done. A rational trier of fact could

16 conclude that Anderson's efforts to inspect the product were

17 deficient even by AMCO's own standards, and indeed, so deficient

18 so as not to be sincere. Akins characterized Pentorali as an

19 employee and concluded that this fact warranted particular

20 concern; however, she was not an employee, and Akins clearly had

21 access to information to that effect. Akins repeatedly used

22 leading questions and sometimes engaged in suggestive remarks

23 during the interviews; in so doing, he was engaging in conduct

24 that even he admitted could affect a witness's testimony and was

25 not appropriate with respect to an effective investigation. It

26 may be inferred that no timely or unbiased effort was made to

27 obtain samples of the salvage nut product or to undertake

28 meaningful testing of that product to determine the extent of

1   fire damage, a central issue.

2        In conclusion, even with respect to facts concerning the

3   investigation that are not disputed, multiple inferences are

4   possible. A rational trier of fact could conclude that the

5   investigation was not thorough or reasonable.

6            D. <u>Biased Investigation</u>

7        In <u>Guebara v. Allstate Ins. Co.</u>, 237 F.3d 987 (9th Cir.

8   2001), the court upheld the trial court's grant of summary

9   judgment to an insurer who had hired several investigators to

10  help determine the scope of a home fire claim that was believed

11  by the insurer to be inflated because some items claimed to be

12  damaged were inexplicably missing from the scene of the fire,

13  there were many inconsistent statements by the insured or insured

14  family members regarding the location or disposition of the

15  items, there was no evidence of bias, and the chief problem with

16  the investigation was delay. There had been a complete

17  investigation by the insurer's experts, and there were

18  corroborative findings by the official, independent arson

19  investigators who found indicators of arson at a time when the

20  insured was in desperate financial straits. The court noted that

21  the genuine dispute doctrine is applied on a case-by-case basis

22  and may be applied in cases involving either an unsettled area of

23  insurance law or a reasonable factual dispute. <u>Guebara</u>, 237 F.3d

24  at 994.  The court noted:

25          Our decision does not eliminate bad faith claims
        based on an insurer's allegedly biased investigation.
26      Expert testimony does not automatically insulate
        insurers from bad faith claims based on biased
27      investigations. Although this list is not exhaustive,
        we can think of several circumstances where biased
28      investigation claims could go to a jury: (1) the insurer is guilty of

73

1  investigatory proceedings, see Tomaselli v. Transamerica Ins.
   Co., 25 Cal.App.4th 1269, 1281, 31 Cal.Rptr.2d 433, 439 (1994)
2  (allowing a bad faith claim to go to the jury where an insurance
   company without any evidence of fraud forced an insured to submit
3  to an examination under oath, dissuaded the insured from having
   an attorney present, and misled the insured about the purpose of
4  the examination); (2) the insurer's employees lie during the
   depositions or to the insured; (3) the insurer dishonestly
5  selected its experts; (4) the insurer's experts were
   unreasonable; and (5) the insurer failed to conduct a thorough
6  investigation.

7  Id. at 996.

8      MQN produced evidence which warrants an inference that

9  Thompson's investigation and report were the product of bias.

10 Excerpts of Thompson's deposition (Gonzalez Decl., Ex. K) reveal

11 that she testified that her husband was an attorney working for

12 the same law firm for which Gordon Park, AMCO's counsel, worked;

13 however, she purported not to know how many times she had worked

14 with his law firm on a litigation matter, although she did recall

15 that she worked on a case involving a loss of chemicals used on

16 grapes and was retained by Gordon Park; further, she had three or

17 four active matters for insurance companies as well (id. at 44,

18 62, 64). Park testified that he or a client had retained

19 Thompson's firm eight to twelve times over fifteen to twenty

20 years. (Decl. of Gonzalez, Ex. H p. 68.)

21     A rational trier of fact might infer that Thompson's status

22 as the spouse of another member of Park's firm is inconsistent

23 with the independence from counsel and the remainder of the

24 investigative effort that is to be expected from a forensic

25 professional. It could be inferred that she had a financial

26 interest in the case above and beyond her compensation as an

27 expert. It might also be reasonably inferred that it would affect

28 her objectivity. A rational trier of fact could infer bias.

1    Other factors suggesting an inference of bias are present.

2  In Tomaselli v. Transamerica Ins. Co., 25 Cal.App.4th 1269

3  (1994), the insured was subjected to an examination under oath

4  (EUO) but was told by the insurer's agent that it was not

5  necessary to have her attorney present and that the EUO was

6  merely a procedure to help settle the claim; the insured was not

7  told that one purpose of it was to investigate potential policy

8  violations; expert testimony established that an insured should

9  be told she might want to have an attorney present; and the

10  insured felt intimidated and badgered during the EUO. Based in

11  part on the EUO, the claim was denied for late notice because of

12  facts that the insurer claimed were likely to alert a reasonable

13  person to the existence of the problem for which coverage was

14  sought. There was evidence that the insurer failed to examine the

15  crack in a concrete foundation relied upon to provide notice, to

16  examine a craftsman who had worked on it during the pertinent

17  time, to examine the status of a pertinent endorsement, or to

18  respond to new information submitted by the insured because of

19  the insurer's position that any further investigation would not

20  have altered the coverage determination. It was held that

21  although an objective approach to the evidence would suggest mere

22  negligence on the part of the insurer in denying coverage, a more

23  sinister set of inferences of bad faith was permissible based in

24  part on the inadequacy of the investigation (failure actually to

25  examine the crack and the maintenance history of the area with

26  the crack), the use of the EUO, and the insurer's misleading of

27  the insured about the purpose of the EUO and the advisability of

28  having counsel present. The presence of innocent explanations for

1   these and other indicia of bad faith did not preclude denial of

2   summary judgment; the jury could find that the handling and

3   denial of the claim were unreasonable and in bad faith. <u>Tomaselli</u>

4   <u>v. Transamerica Ins. Co.</u>, 25 Cal.App.4th 1269, 1281-82 (1994).

5       Joseph W. Hearington, Jr., the corporate director of

6   internal auditing for Defendant Universal Corp, and vice-

7   president of Universal Leaf Tobacco Co., Inc., declared that he

8   had been advised by Melton on January 8, 2004, that an accountant

9   named Schroeder had been retained to assist with MQN's insurance

10  claim and to review claim documentation, which had not yet been

11  submitted. Melton told Hearington that because Shroeder was in

12  Sacramento, Hearington could contact Susan Thompson of Hemming

13  Morse locally regarding the final preparation of the claim.

14  Hearington contacted her and asked Thompson what she had been

15  engaged to do; she replied that she was a manager with Hemming

16  Morse; her company specialized in "helping" smaller insureds like

17  MQN process the difficult areas of claim recoveries, often at the

18  expense of the insurance carrier, and participating in what was

19  represented as a common practice of helping the insureds; and in

20  their case she would be "helping" MQN with final preparation of

21  the proof of loss, calculation of business interruption recovery,

22  and identifying and claiming other recoverable expenses. (Decl.

23  ¶¶ 8-11.)

24      Thompson told MQN people when she set up her meeting with

25  them where she worked and that she had been hired by the insurer

26  to help them with their business interruption; she did not

27  mention any allegation of misconduct. (<u>Id.</u> 31, 36.) She testified

28  that she did not know when she first learned that Chris Glenister

was working on the matter and did not remember if she was advised
that Glenister and his firm were working with MQN when she first
met with Park, and she did not remember if she advised Glenister
that she would be having the meeting with MQN people. (Id. at 44-
45). When asked if she recalled being told by Park not to tell
Glenister that she was going to meet with Carmina and Grant, she
replied, "Absolutely not," and further stated that she was not
even sure she knew Glenister existed when she met with Carmina
and Grant (id. at 51). However, when her recollection was
refreshed with her notes, she recalled that at her first meeting
with Park and Akins, she was informed that Greenspan (Glenister's
firm) had been hired by MQN (id. at 81-82); she met with Park on
the seventh and then talked to Tapia and Willits the following
day (id. at 93). It is clear that Thompson was assisting the
insurer; correspondence from Park to Thompson dated March 3,
2004, which is authenticated sufficiently from all indicia,
indicates that Park stated that she had helped prepare a list of
documents desired from Tapia and was invited to suggest questions
for the upcoming examination under oath of Tapia. (Gonzalez
Decl., Ex. L.)

     Glenister testified that he had known and had worked with
Thompson before working on MQN's claim. One or two days after
Thompson's visit with Tapia or learning of the visit, he
contacted Thompson and asked why Greenspan had not been called as
a courtesy to let them know that she had been retained, and had
not been given the opportunity to meet with her when she appeared
at MQN that day; Thompson advised Glenister that she was acting
on the instructions of her client. (Decl. of Gonzalez, Ex. O p.

36.)

Park testified that he was familiar with the Greenspan company, which did not like anyone from the insurance company meeting with the insured without their being present; the custom and practice would be that Glenister would be present during that whole discussion. (Gonzalez Decl., Ex. H p. 84.)

Thompson denied that she asked Tapia to sign any document during the meeting, but she did testify that Tapia signed a sworn statement and proof of loss in her presence during the meeting despite Tapia's having said that there were a few things not on there yet and her having made notations to that effect; further, Thompson asked her if it was the final document and asked if she was going to sign it so that they had something to start with or not; Thompson also remembered that after Thompson asked Tapia if she had a proof of loss and after Tapia had provided the unsigned document to Thompson, Thompson told her that if she was going to sign it, to sign each page and number the pages (id. 47-50). Thompson admitted that she asked for copies of documents during the meeting, they agreed to copy the documents, and the insurer did ultimately obtain the copies (id. at 51-52). Although AMCO objects to the evidence as without foundation, given the testimony of Thompson and the other indicia of its identity, Exhibit M to Gonzalez's declaration appears to be a proof of loss statement signed by Tapia on January 8, 2004.[7]

Gonzalez refers to a letter dated January 16, 2004, from Park to Akins, in which Park stated that at the meeting on

---

[7]Counsel for MQN explains that the Tapia deposition testimony was taken the day before the brief was due. (Decl. of Gonzalez, ¶ 61.)

January 7, 2004, of Park, Thompson, and Akins, it was agreed to have Thompson make an effort to meet with Tapia to see if they would be cooperative and provide access to records and to see whether Tapia would sign a proof of loss. The same letter states that since that meeting, Thompson was able to gain access to the company and obtain a signed statement of loss (Gonzalez Decl., Ex. N.) Although objections are made to this evidence on the basis of lack of foundation, hearsay, and relevance, the letter itself contains sufficient indicia for authentication; the letter is not hearsay but rather may be used for the fact that the statement was made and thus to serve as impeachment of Thompson.

In summary, a rational trier of fact could conclude that at AMCO's direction, Melton and Thompson, agents of AMCO, intentionally misrepresented to MQN agents the status and function of Thompson and the purpose of the meeting, all with the object of obtaining information immediately from MQN personnel outside the presence of Glenister, who was known to be serving as AMCO's outside adjuster and who, according to industry standards, should have been given an opportunity to be present. A rational trier could conclude that Thompson was dishonest and biased, and that therefore, her investigation and conclusions were tainted and unreliable.

Cases applying the genuine dispute doctrine in situations involving factual disputes (as distinct from legal issues involving the reasonableness of an insurer's interpretation of the contract) often involve the insurer's reliance on multiple independent experts. See, Guebara, 237 F.3d 987 (three independent experts plus the insured's inconsistent

1   explanations); <u>Hubka v. Paul Revere Life Ins. Co.</u>, 213 F.Supp.2d

2   1089, 1092-95 (S.D.Cal.2002); <u>Phelps v. Provident Life and</u>

3   <u>Accident Ins. Co.</u>, 60 F.Supp.2d 1014, 1021 (C.D.Cal.1999)

4   (multiple independent experts and surveillance film); <u>Allstate v.</u>

5   <u>Madan</u>, 889 F.Supp. 374, 381 (C.D.Cal.1995) (multiple independent

6   experts). However, it has been held that the single report of an

7   independent expert may be sufficient to support application of

8   the genuine dispute doctrine; the Court must consider the record

9   as a whole and consider each bad faith claim on a case-by-case

10  basis in determining whether an insurer's denial of a claim was

11  reasonable. <u>Adams v. Allstate Ins. Co.</u>, 187 F.Supp.2d 1219 (C.D.

12  Cal.2002).

13      Here, a rational trier could infer that neither Thompson nor

14  in-house personnel of AMCO were independent, objective, or

15  unbiased.

16      Other factors invite reasonable inferences to the effect

17  that the investigation was biased, incomplete, or unreasonable.

18  Anderson testified that an outside vendor could come in to help

19  the insured and Anderson inventory items damaged; he could not

20  recall if he offered such services to MQN, although he usually

21  did so. MQN was already in the process of boxing up the inventory

22  and was going through it on its own. (Dep. p. 10, 12-13.) One

23  reasonable inference is that he did not think that the insurer

24  needed such help, or that he may have offered; however, this

25  Court must draw all reasonable inferences favorable to the

26  nonmoving party. One reasonable inference is that in the face of

27  the involvement of a massive amount of product and damage,

28  Anderson and AMCO did not offer the help despite a situation that

1  clearly called for it, and that such conduct was unreasonable.

2  Willingness to reconsider a denial of coverage and to

3  continue investigation of a claim has been held to weigh in favor

4  of good faith, whereas an early closure of an investigation and

5  unwillingness to reconsider a denial when presented with evidence

6  of factual errors would support a finding of bad faith. Shade

7  Foods, Inc. v. Innovative Products Sales & Marketing, 78

8  Cal.App.4th 847, 880 (2000).

9  It is undisputed that AMCO advanced a substantial portion of

10 the claim. Akins declares that AMCO would reconsider its position

11 in this matter and act accordingly if Park were demonstrated to

12 be incorrect in his conclusions. (Akins Decl. ¶ 29.) MQN objects

13 to this evidence as lacking foundation for Akins to make this

14 statement on behalf of AMCO because he did not decide to deny the

15 claim, and because other evidence is such that a rational jury

16 could disagree with based on the evidence in opposition to the

17 motion.

18 Although AMCO made advance payment of a significant portion

19 of the claim and maintains to this day that it is willing to

20 reconsider its determination upon receipt of appropriate

21 evidence, it is not for this Court to resolve conflicting

22 rational inferences on this motion.

23 MQN points to evidence warranting an inference that various

24 AMCO personnel who were active in the fraud investigation,

25 including Thompson and Melton, did not tell various persons who

26 were employed by or were acting on behalf of MQN (Hearington,

27 Migdal, Greenspan, or others) that there were allegations of

28 insurance fraud by Pentorali, an issue of commingling, or a

1  question regarding location of product in the plant at the time

2  of the fire. (Decl. of Gonzalez, Ex. K at 36; Decl. of Joseph

3  Hearington, Jr. ¶¶ 8-11; Dep. of Melton, Gonzalez Decl., Ex. C

4  pp. 20-21.) Further, Akins testified that he never told Tapia or

5  Willits of the alleged fraud, commingling, or location of product

6  at the time of the fire and did not know anyone else at AMCO,

7  other than perhaps legal counsel, who would have done so. (Decl.

8  of Gonzalez, Ex. F pp. 76-77.) Park testified that it was not his

9  practice to reveal fraud or commingling allegations at the

10  beginning of the investigation because of the desire to obtain

11  truthful testimony unrelated to what the insurer knew or did not

12  knew, and because the investigation might ultimately reveal that

13  the insured's claim was fully supported. (Gonzalez Decl., Ex. H

14  p. 49-50.) However, he claimed to have revealed the allegation to

15  Davis relatively early in the EUO process and while he was in the

16  middle of the examinations under oath, although the precise time

17  is not clear. (Id. p. 43.) Gonzalez declares that the first EUO

18  was of Tapia on April 5, 2004. (Decl. ¶ 47.)

19      In any event, the insurer had no affirmative duty to provide

20  an opportunity to the insured directly to respond to a third

21  party's allegations of fraud before denying a claim. Feldman v.

22  Allstate Insurance Co., 322 F.3d 660, 669 (9th Cir. 2003); Cal.

23  Code Regs. tit. 10, § 2695.7(b)(2), (c)(2).

24      The drawing of reasonable inferences in favor of the insurer

25  is possible at many points of the analysis. The fact that the

26  insurer made substantial payment on the claim warrants an

27  inference that it proceeded in good faith; however, having made a

28  payment cannot insulate an insurer from inferences against it

based on other conduct at other points in the claims process. The
insurer used a forensic accountant who employed what might be
inferred to be reasonable methods; however, the conduct of the
insurer and accountant in the course of that documentary
investigation warrants an inference not merely of negligence or
mistaken judgment, but rather of unfair dealing and intent to
harm MQN or disregard its rights that is incompatible with an
inference of mere negligence or overzealousness. Akins proceeded
in some respects in a manner that even he testified was not
likely to obtain reliable information. It is possible in this
case to draw the more sinister set of inferences to the effect
that the investigation was designed or carried out to gather
information supportive of the insurer's position, and that
evidence that warranted caution, disbelief, or additional
investigation by the insurer was overlooked, systematically
undervalued, or excluded from the investigatory process; and that
the reason for this was that the insurer had the intention to
deny the claim in order to recoup all portions of the claim.

In summary, the Court concludes that conflicting inferences
are possible with respect to whether or not AMCO's investigation
was reasonable, thorough, or biased, and as to whether or not
AMCO's denial of MQN's claim was unreasonable, unfair, and in bad
faith. AMCO has not established under the pertinent legal
standards that there was a genuine dispute as to coverage
affecting entitlement to benefits and the scope of the loss. A
rational trier could conclude that AMCO's conduct was not
prompted by honest mistake, bad judgment, or negligence, but
rather was consciously and deliberately undertaken, and that it

unfairly frustrated the parties' agreed common purposes and the reasonable expectations of the insured.

VII. <u>Punitive Damages</u>

The mere fact that an insurer is determined to have breached its duty to deal reasonably and in good faith with the insured, and thereby to be liable for compensatory damages, does not automatically entitle the insured to punitive damages. <u>Neal v. Farmers Ins. Exchange</u>, 21 Cal.3d 910, 922 (1978).

Cal. Civ. Code § 3294 provides in pertinent part:

> a) In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.
>
> . . .
>
> (c) As used in this section, the following definitions shall apply:
>
> (1) "Malice" means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.
>
> (2) "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.
>
> (3) "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.

"Despicable conduct" is conduct that is so vile, base, contemptible, miserable, wretched, or loathsome that it would be looked down upon and despised by ordinary, decent people, <u>Mock v. Michigan Millers Mutual Ins. Co.</u>, 4 Cal.App.4th 306, 330 (1992);

1   it has the character of outrage frequently associated with crime,

2   Tomasellil, 25 Cal.App.4th at 1287. If the defendant's acts are

3   reprehensible, fraudulent, or in blatant violation of law or

4   policy, then punitive damages are appropriate. Id. Unintentional

5   conduct is not sufficient. Mock, 4 Cal.App.4th at 332. The

6   defendant must act with the intent to vex, injure, or annoy the

7   plaintiff, or with a conscious disregard of the plaintiff's

8   rights. Neal v. Farmers Ins. Exchange, 21 Cal.3d 910, 922 (1978).

9   Mere carelessness or ignorance does not justify punitive damages;

10  rather there must be tortious conduct rising to the level of

11  extreme indifference to the plaintiff's rights, a level which

12  decent citizens should not have to tolerate. Tomaselli, 25

13  Cal.App.4th at 1286-87. Conduct constituting negligence,

14  overzealousness, legal error, and callous failure to communicate

15  does not support a punitive damages award. Tomaselli, 25

16  Cal.App.4th at 1288. Merely taking an unreasonable position is

17  insufficient to establish intent to harm or malice. Beck v. State

18  Farm Mutual Auto Ins. Co., 54 Cal.App.3d 347, 356 (1976). "Clear

19  and convincing evidence" requires a finding of high probability

20  based on evidence that is sufficiently strong to command the

21  assent of every reasonable mind and so clear as to leave no

22  substantial doubt. Id. (citing In re Angelia P. 28 Cal.3d 908,

23  919 (1981)).

24      Using an expert's opinion that lacks a firm basis, and is

25  contrary to the weight of expert evidence, as a pretext to end

26  contractual benefits could be construed by a reasonable juror as

27  clear and convincing evidence of a conscious disregard of a

28  plaintiff's rights. Hubka v. Paul Revere Life Ins. Co., 215

1  F.Supp.2d 1089, 1095 (S.D.Cal. 2002) (where treating doctors all

2  opined that the plaintiff was disabled, an independent doctor

3  found that the plaintiff had lost fifty percent of his capacity

4  for heavy work, the only doctor not finding the plaintiff

5  disabled was an in-house doctor who did not know the requirements

6  of the plaintiff's work and had not examined the plaintiff, the

7  insurer failed to obtain an expert chiropractic opinion as

8  advised by the insurer's chosen IME, and the court noted the

9  absence of multiple independent experts supporting the insurer's

10 position).

11     Taking an adamant position and refusing to change it,

12 avoiding discovery of adverse information or documentation

13 thereof, coaching the insured to share the insurer's position,

14 failure timely to inform the insured of a conflict of interest,

15 and examining cross-files of other insureds has been held to be

16 sufficient to warrant an inference of callous indifference and an

17 intent to vex, injure and annoy the insured, and thus to uphold

18 an award of punitive damages. Betts v. Allstate Insurance Co.,

19 154 Cal.App.3d 688 (1984).

20     Punitive damages are appropriate where the insurer refused a

21 full investigation or examination of the claimant, made the

22 claimant cry, terminated benefits when the insured was still ill,

23 and attempted to make the insured surrender the policy if the

24 insured did not take a smaller check. Egan v. Mutual of Omaha

25 Insurance Co., 24 Cal.3d 809 (1979).

26     Akins declares that AMCO did not act to vex, injure, or

27 annoy MQN but only to seek guidance as to whether its conclusion

28 that MQN had improperly exaggerated its insurance claim and

1  thereby voided its insurance policy was correct. (Decl. ¶¶ 30-

2  31.) MQN objects to the evidence as a conclusion, and as without

3  foundation for testimony as to motives of others at AMCO. The

4  Court sustains these objections.

5      AMCO points to additional evidence that it asserts precludes

6  punitive damages. It is undisputed that due to AMCO's

7  investigation, MQN hired counsel and had access to counsel and to

8  the services of a public adjuster, which it hired to assist it in

9  responding to AMCO's inquiries and to prove its claim. It is also

10  undisputed that Park wrote Tapia through MQN's attorney Jeffrey

11  Davis and provided MQN with copies of some or all the information

12  AMCO had gathered in the course of its investigation; it appears

13  that other documentation of the investigation had been sent to

14  the insured. AMCO claims that this shows scrupulous fairness and

15  further notes that MQN failed to respond to Park's explicit

16  invitation to respond to the information (i.e., to send him

17  information, facts, or arguments that might be relevant or that

18  might show the facts as stated by AMCO were in error (Park Decl.,

19  Ex. 5 p. 20) and advise AMCO if it had reached the wrong

20  conclusion. However, when this letter was sent, AMCO's lawsuit

21  had already been filed. A rational fact finder could infer that

22  the letter was pretextual or undertaken self-protectively.

23  Further, a rational trier of fact could conclude that MQN's

24  undisputed filing of the counterclaim for breach of contract,

25  extra-contractual damages, and bad faith was a response of sorts.

26  Finally, this evidence does not undercut the reasonable

27  inferences of bad faith discussed in the foregoing analysis.

28      The parties dispute whether MQN has ever indicated that its

1  continued existence depends upon the outcome of this dispute.

2  Akins declared that to AMCO's knowledge, this dispute was simply

3  one between relative commercial equals with roughly equal

4  economic power and sophistication. (Decl. ¶ 32.) Davis declares

5  that MQN produced unspecified financial records to AMCO at the

6  outset of AMCO's investigation; further, based on Davis's review

7  of the records, MQN definitely does not have roughly equal

8  economic power as AMCO. Davis also declares that AMCO has enjoyed

9  significant leverage over MQN throughout the matter because MQN

10  has incurred tremendous expense in defending against AMCO's

11  unfounded allegations and that there is no contractual basis for

12  recovery of those legal fees and related operational expenses

13  incurred by MQN. AMCO objects that Davis's statements are based

14  on hearsay, irrelevant, self-serving, lacking in foundation,

15  improper legal conclusion, and expert opinion evidence without

16  qualification as an expert. The Court concludes that Davis is

17  qualified and appears to have personal knowledge to report the

18  expense undertaken by MQN in the litigation in which he is

19  participating; further, it likewise appears that there is a

20  foundation for his opinion regarding the absence of a contractual

21  basis for payment of fees and expenses incurred by MQN. As to the

22  conclusion or opinion regarding the financial position of the

23  parties, no foundation has been shown.

24      In connection with its argument that the evidence in this

25  case is insufficient as a matter of law to support an award of

26  punitive damages, AMCO cites various cases. In two of the cases,

27  Mock v. Michigan Millers Mutual Ins. Co., 4 Cal.App.4th 306, 329-

28  330 (1992), and Basich v. Allstate Insurance Company, 87

88

Cal.App.4th 1112 (2001), there is no useful analysis of a body of

evidence. In <u>Beck v. State Farm Mutual Auto Ins. Co.</u>, 54

Cal.App.3d 347, 355-56 (1976), also cited by AMCO, the insurer

took an unreasonable position on the validity of a defense to

coverage and failed to act on separate property damage and

medical payments claims. In internal memoranda the insurer

recommended that even though the insured had a valid uninsured

motorist claim, the issue of the insured's failure to make a

police report should be used in settlement negotiations. The

insured was claiming far more damages than she had proved. The

withholding of benefits under those circumstances was sufficient

to support a verdict of bad faith but insufficient to permit an

inference of intent to harm or actual malice or oppression,

despite an admission of a claims representative that he knew that

it would vex or oppress the insured. <u>Beck</u> is not sufficiently

analogous on its facts to guide the Court in this instance.

The holdings in several cases relied on by AMCO underscore

the principle that the bar has been set at a high level for the

sufficiency of the evidence to demonstrate malice or oppression.

In <u>Shade Foods, Inc. v. Innovative Products Sales & Marketing,</u>

<u>Inc.</u>, 78 Cal.App.4th 847, 892 (2000), the court found

insufficient the insurer's initial inflexible position on

extremely complex coverage issues combined with failure to

communicate with the insured and a minimal investigation that

would have revealed the weakness of the insurer's coverage

position; the evidence warranted an inference of negligence and

stubbornness at most. Comparable conduct in connection with

another insured combined with insistence upon unreasonable

conditions to a settlement offer were likewise held to be insufficient. Id. at 893. Misleading the insured as to coverage and then clarifying its position was likewise insufficient. Id. at 909-10. The court characterized the cases as being marginally sufficient cases of bad faith but inadequate to constitute despicable conduct in conscious disregard of the insured's rights. Id. Unlike Shade, the instant case did not involve extremely complex coverage issues.

In Tomaselli v. Transamerica Ins. Co., 25 Cal.App.4th 1269, the court reversed a judgment after verdict of punitive damages supported by evidence of the insurer's hiring counsel, failing to investigate, misleading the insured about an EUO and dissuading the insured from having counsel present, and erroneously relying on an endorsement which was not shown to have been delivered; the judgment was unsupported by any evidence of a pattern or practice of handling claims in bad faith. The court determined that the evidence did not meet the high quantum of proof of malice, oppression, or despicable conduct. At most there was a basis for an inference of overzealousness, negligence, bureaucratic inertia, and inefficiency. Id. at 1288. In Stewart v. Truck Ins. Exchange, 17 Cal.App.4th 468, 482-84 (1993), involving a substantial and complex question of medical causation regarding which the jury had ultimately concluded that the insured had been seventy-five per cent responsible, the court likewise concluded that evidence of the insurer's delay in investigating and making settlement offers were insufficient to constitute malice.

The present case is similar in the sense that when limited evidence is viewed, one set of inferences is that the insurer

1  acted with some evidence supporting its position and thereafter

2  engaged in overzealous and negligent conduct. However,

3  consideration of the totality of the evidence in this case

4  renders uncertain the line between mere overzealousness and

5  negligence, on the one hand, and on the other a course of conduct

6  undertaken not with a good faith desire to investigate

7  reasonably, but with an awareness of a high likelihood of

8  extremely negative effects upon the insured, with a purpose to

9  reach a desired position on the claim in disregard of the

10 totality and probative force of the evidence, and without heeding

11 known and established norms of conduct. In the present case, the

12 trier of fact could conclude that the insurer was not only inept,

13 but was also consciously biased and took advantage of an

14 opportunity to avoid its coverage obligation entirely to the

15 known detriment of the insured. A rational trier of fact could

16 infer that in multiple instances and respects, AMCO consciously

17 investigated unreasonably and with bias; purposefully engaged in

18 significant misrepresentations to the insured with respect to the

19 process; and unilaterally sought sworn information from the

20 insured without notice to, or opportunity for input from, the

21 insured's known agent and advisor. It is fundamentally the

22 obligation of the trier of fact to evaluate the seriousness of,

23 and risks presented by, any misconduct by either of the parties

24 and the precise intentions and other pertinent states of mind of

25 the relevant agents.

26      The present case does not present complex legal issues of

27 coverage; here, there is really only one major factual issue.

28 There is significant evidence of not mere nonfeasance or

1  overzealousness, but of actual bias in the investigation

2  undertaken in what in a full factual context might be inferred to

3  be conscious disregard of the rights of the insured and

4  potentially even intent to harm the insured. The alleged

5  mishandling of the claim and failure of the investigation

6  concerned the most critical evidence available with respect to

7  the alleged fraud of the insured. This case involves not merely

8  economic harm, but with respect to the interest of the insured,

9  also the interest in reputation and in freedom from criminal

10  process and sanctions.

11      With respect to the clear and convincing standard, the Court

12  on summary judgment is not permitted to resolve evidentiary

13  conflicts with respect to material issues of fact or generally

14  to engage in weighing the evidence or resolving credibility

15  disputes. Although the higher burden of persuasion required of

16  the bad faith claimant is the same on summary judgment and at

17  full trial on the merits, the evidentiary context is necessarily

18  different. A large body of evidence may be expected to be

19  introduced at trial concerning matters which are only developed

20  skeletally in these motion proceedings, including the inventory

21  tracking and other documentary practices of the insured and the

22  insurer's information regarding those practices; key witnesses'

23  opportunity to perceive and recollect various events before and

24  after the fire; the apparent credibility of the various reporting

25  witnesses, including important witnesses from MQN from whom

26  little sworn testimony has been presented; available evidence

27  concerning the location and condition of massive amounts of

28  product at the time of and after the fire; the extent of

1   cooperation between the parties; and the value of the methodology

2   of the expert witnesses and other agents acting on behalf of the

3   parties, etc.

4        The instant case presents a close case with respect to the

5   sufficiency of an evidentiary basis upon which to infer malice or

6   oppression warranting punitive damages. Given the state of the

7   evidence, the Court at this point should not say that the

8   evidence of AMCO's conduct could not be considered clear and

9   convincing evidence of reprehensible, despicable conduct

10  undertaken with an intention to vex or harm MQN and/or with a

11  conscious disregard of the potentially serious, unjust

12  consequences to MQN and of MQN's rights. AMCO has not established

13  that it is entitled to judgment as a matter of law on the issue

14  of the adequacy of the evidence to establish punitive damages by

15  clear and convincing evidence.

16       VIII. Disposition

17       Accordingly, the Court DENIES the motion of Plaintiff and

18  Counter-defendant AMCO Insurance Company for partial summary

19  judgment on the bad faith counterclaim.

20

21  IT IS SO ORDERED.

22  **Dated:    July 26, 2006**            **/s/ Sandra M. Snyder**
    icido3                        UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28

93